**Roxanne E. SAGE, in her capacity as Executrix of the Estate of Peter C. Foy, III, deceased, John Senatore, and Robert Dowe, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Action No. 4:96cv38.

United States District Court,
E.D. Virginia,
Newport News Division.

Aug. 22, 1997.

Andrew M. Sacks, Sacks & Sacks, Norfolk, VA, Randy D. Singer, Willcox & Savage, Norfolk, VA, for Plaintiffs.

Lawrence E. Leonard, Asst. U.S. Atty., Norfolk, VA, for Defendant.

### OPINION AND FINAL ORDER

REBECCA BEACH SMITH, District Judge.

This action under the Federal Tort Claims Act arises out of a random act of violence perpetrated against three innocent business executives by Dr. Jean Claude Pierre Hill, an active-duty Captain in the United States Army with a history of mental illness. On April 8, 1991, Hill, who had recently been hired as a psychiatry resident by the prestigious Hahnemann University, double-parked his car on a busy Philadelphia, Pennsylvania thoroughfare and exited his vehicle. Hill calmly walked up behind Peter Foy, John Senatore, Robert Dowe, and Leonard Allen, and dispassionately gunned them down.

Plaintiffs in this action are Dowe and Senatore, whose injuries, though severe, were not fatal, and the Executrix of Foy, who died as a result of the gunshot wounds inflicted by Hill. Defendant is the United States of America, which had been treating Hill in various military and Veteran's Administration psychiatric hospitals in the months leading up to the shooting. The case was tried by this court without a jury. Both parties have submitted a post-trial memorandum, and the matter is now ready for decision.

### BACKGROUND

1. Jean Claude Hill excelled academically, graduating as valedictorian of his class from Surry High School in Virginia, before going on to college and ultimately receiving a medical degree from the University of Wisconsin in 1987.

2. After graduating from medical school, Hill completed a one-year internship at a hospital in the Bronx, New York City, New York, when his mental health apparently began to wane. He moved back to Virginia to be closer to his family and entered a residency program in psychiatry at the Eastern Virginia Medical School in Norfolk.

3. During the summer of 1988, Hill began to suffer increasing psychiatric problems. He left his residency program at Eastern Virginia and was officially terminated from that program in November, 1988.

4. Urged on by his concerned parents, Hill sought professional help from Dr. Neena Singh, a psychiatrist in Hopewell, Virginia. On or about February 16, 1989, Singh interviewed Hill and made a diagnosis of major depression. Although Singh recommended inpatient hospitalization, Hill declined to consent, noting that he wished to try outpatient treatment first.

5. During the course of the year, Hill's condition severely and quite noticeably worsened. Hill became increasingly withdrawn from his family. He paid less attention to his personal hygiene, and he developed an unhealthy fascination with guns and knives.

During the summer of 1989, Hill began to carry a loaded revolver around the house. On at least one occasion, Hill apparently answered the door naked but for a butcher knife he carried in his hand. Hill's aberrant and increasingly frightening behavior finally became too much for his parents when, during a late summer night, Hill discharged a firearm in his bedroom.

6. Fearing for their own safety, as well as that of their son, Hill's parents sought a temporary detention order to have him involuntarily committed to a mental institution on or about September 1, 1989. During the commitment proceedings, Hill was or became floridly psychotic. Hill denied that he had any psychiatric illness. When that view was challenged, Hill became combative, attacking the judge who committed him, as well as a sheriff's deputy, before finally being forcibly restrained.

7. Hill was admitted to the John Randolph Hospital in Hopewell, Virginia on September 1, 1989, and diagnosed by Dr. Singh with major depression. He was transferred to a psychiatric treatment facility, Central State Hospital, later that day. Less than two weeks later, Hill was transferred to the Medical College of Virginia ("MCV"), where he remained an inpatient until approximately November 16, 1989. During this period of hospitalization, Hill was variously diagnosed with major depression with psychotic features, organic mood disorder, organic mental disorder, passive-aggressive personality disorder, and hypothyroidism.

8. Upon his discharge from MCV and until July, 1990, Hill was treated on an outpatient basis by Dr. John Furr, a psychiatrist in Norfolk, Virginia. During that period, Furr saw Hill weekly for the first four weeks and then intermittently over the next six months. Furr diagnosed Hill with schizophrenia, undifferentiated type, and never recommended that his patient be recommitted.

9. In July, 1990, the United States Army called Hill to active duty to serve an obligation based on a previous ROTC scholarship commitment. Hill reported to Fort Sam Houston in Texas for the medical officer's indoctrination training in late July, 1990.

10. Army personnel quickly ascertained that all was not well with their new recruit, who acted confused and strange. Indeed, by this stage in his illness, Hill was unable to complete the most basic forms necessary for inprocessing.

11. Concerned over Hill's obvious difficulties, officials referred him to Wilford Hall at Lackland Air Force Base for a psychiatric evaluation. On his second day of admission, Hill tried to leave the hospital. When hospital staff refused to let him leave, Hill became combative and had to be forcibly restrained. Over the next several weeks, doctors at Wilford Hall diagnosed him as suffering from schizophrenia, disorganized type, and then bipolar disorder. Because either of these conditions necessarily disqualifies one from military service, officials ordered a medical evaluation board ("MEB") to determine Hill's fitness for duty.

12. The military determines such issues as medical fitness, retention, and disposition through the use of MEBs and physical evaluation boards ("PEBs"). A MEB begins the process by evaluating the soldier's fitness and the extent of the disability. If the MEB finds that the soldier does not meet retention standards, it refers the case to a PEB. The PEB then reviews the MEB's findings. If the PEB concurs that there is a disability that should lead to termination from the service, it then further decides whether the military is in some way responsible for the condition and if any benefits are owed.

13. The PEB is a fact-finding body that follows quasi-judicial procedures. Army regulations set forth the procedure that must be followed, and all individuals, including Hill, who are subject to the MEB/PEB process are provided certain procedural due process rights. Thus, the patient may either agree with or challenge the board's final findings and conclusions.

14. In August, 1990, Dr. Donald Winter, a physician at Wilford Hall, prepared a MEB narrative summary. Winter rated Hill's social and industrial impairment as total and found him incompetent to perform duties of any type. Hill's case then proceeded to the PEB stage.

15. Hill remained at Wilford Hall until mid-September, 1990. During this time, Hill sank into a ranting, psychotic state. His doctors noted that Hill became more violent and threatening. During a confrontation with Winter, one of his treating physicians, Hill lashed out and broke the doctor's nose. For weeks thereafter, Hill was uncontrollable, and had to be kept in four-point restraints. In this period of florid psychosis, Hill lashed out verbally at hospital staff, and threatened to drop a nuclear bomb on Montreal or Minnesota. Doctors tried to wean Hill away from the four-point restraints by releasing one arm or leg at a time. These efforts had to be discontinued, however, as Hill would try to use his free arm or leg to attack the staff. At times, Hill's treating team had to use five-point restraints, with the fifth restraint across his abdomen to keep him from tearing loose from the other straps. Hill's violence during this period was directed at various staff members; apparently, Hill never harmed or threatened other patients.

16. During his hospitalization at Wilford Hall, Hill was treated with a variety of medications, including Haldol, Ativan, and Cogentin. These drugs, which Hill intermittently refused, had little noticeable effect.

17. Pursuant to military procedure, Hill was designated for transfer to the Veteran's Administration ("VA") hospital nearest to his home of record for treatment while awaiting the findings of the MEB/PEB process. Accordingly, officials transferred Hill in restraints to the VA hospital in Hampton, Virginia, on or about September 18, 1990.

18. While at Hampton, Hill showed little improvement. His doctors tried various medications, including Klonopin and Haldol, though again to little apparent effect. Hill was diagnosed with schizoaffective disorder, organic mood disorder, and hypothyroidism. Because Hill failed to show improvement, on or about October 10, 1990, he was transferred to the Salem VA Medical Center in Salem, Virginia, the regional treatment facility for patients with chronic psychiatric problems.[1]

19. While Hill had to be confined in restraints upon his arrival at Salem, he soon exhibited dramatic improvement following an adjustment to his medications. By mid-November, 1990, Hill demonstrated no signs of suffering from the disorganized and delusional thinking which had plagued him in Texas and at Hampton. In a marked contrast to Hill's earlier behavior, his final treating physician at Salem, Dr. Frank Tellion, reported that Hill no longer expressed violent or suicidal thoughts. Whereas Hill had refused to take certain medications during the earlier stages of his hospitalizations, by late November he was in compliance with the drugs prescribed by Tellion, namely Loxitane, Klonopin, Symmetrel, and Synthroid.

20. During Hill's stay at Salem, doctors used "incentive therapy" to achieve their goal of providing their patient with the least restrictive care possible. As Hill's condition continued to improve, doctors allowed him increasing freedom of movement so that they could assess his condition in a less controlled setting. Hill worked successfully in the Salem VA hospital's library and had full privileges to explore the grounds. Hill received passes to leave the hospital grounds, and he even obtained a pass to spend Thanksgiving with his family. Remarking on this visit, his family indicated that Hill seemed healthier than he had been at any time since 1988.

21. Hill did continue to dispute the nature of his mental illness. He argued that his illness stemmed from a thyroid condition, and hence was organic in nature, as opposed to being the result of an underlying psychiatric condition.

22. Because Hill no longer appeared to be a danger to himself or others, the treatment team at Salem decided that he had no further need of inpatient hospitalization and approved him for discharge. Salem's discharge summary noted that Hill was now competent to handle his own finances. Dr. Tellion, whose discharge diagnosis was bipolar disorder and hypothyroidism, kept Hill on the same medications that had sparked his improvement: Loxitane, Klonopin, Symmetrel, and Synthroid. Of these drugs, Loxitane is an anti-psychotic. Klonopin, although perhaps not a classic mood stabilizer, has mood

---

**1.** During his stay in Salem, Hill was technically assigned to the Kenner Army Hospital at Fort Lee, Virginia, and attached to the Salem VA hospital.

stabilizing effects and hence may be used for that purpose. Symmetrel is used to alleviate some of the side effects caused by the other medications, and Synthroid is used to combat hypothyroidism.[2]

23. At the end of November, 1990, Hill was discharged from Salem and assigned to the Medical Holding Company at Fort Eustis, Virginia. At this time Hill was still engaged in the PEB procedure, and a medical holding detachment such as the one to which he was assigned is an administrative assignment designed, in part, for soldiers who are awaiting discharge pursuant to a PEB. Although Hill's technical designation was that of an inpatient without a bed, or an inpatient subsisting at home, for all practical purposes he was an outpatient subject to some monitoring.

24. Whereas Hill had previously been transferred in restraints, the Salem treatment team judged him competent to arrange his own transportation to Fort Eustis. Thus, Hill traveled unaccompanied and without incident by bus from Salem to Fort Eustis, where he reported on time and as directed.

25. As a soldier assigned to the holding company, Hill was thoroughly evaluated on December 18, 1990, by the staff psychiatrist at the McDonald Army Hospital at Fort Eustis, Dr. Michael Etzel. During this initial mental status examination, Etzel, who would serve as Hill's treating psychiatrist until early April, 1991, found Hill to be alert and oriented, cooperative, with a stable mood, fair insight, and with an appropriate affect. While acknowledging Salem's diagnosis of bipolar disorder, Etzel diagnosed Hill with schizophrenia, disorganized type in remission, but continued him on the same four medications prescribed by Dr. Tellion, which medications were apparently responsible for his marked improvement. These drugs can be used to treat schizophrenic as well as bipolar patients.[3]

26. In light of Hill's condition, Etzel did not require that Hill remain on base, but instead issued an order allowing his patient to subsist at home with his parents while assigned to the Medical Holding Company.

27. As part of the MEB/PEB process, Etzel reviewed the course of Hill's treatment since his admission to the Army and forwarded an addendum to Hill's medical board on January 3, 1991. In his report, Etzel noted that Hill appeared alert, cooperative, well-dressed, and appropriately groomed. Whereas Hill's insight in the past had been labeled poor, his insight towards his illness by this time was fair. His intelligence and memory had returned to normal limits. Etzel stated that Hill seemed to be suffering neither from hallucinations or delusions, nor from homicidal or suicidal thoughts. Importantly, Hill stated that he was taking his medications, and Etzel perceived no unusual behavior which might suggest otherwise.

28. Hill reviewed the addendum report in January, 1991. On approximately February 7, 1991, and pursuant to Army regulations, Hill challenged the MEB finding that his disability predated his service. Hill did not dispute the ultimate finding that he had a mental illness disability. Corrie Shaner, a civil service government employee who counseled Hill regarding his potential rights and benefits as part of the MEB/PEB process, met with Hill on several occasions. At no time during these meetings, in which Shaner explained the potential positive or adverse rulings, did she perceive any abnormal or unstable behavior, nor did she witness Hill acting in a threatening manner.

29. Although Hill was allowed to subsist at home, he was not unsupervised. For example, Hill was required to call in daily to report his status, and on at least one occasion, Sergeant Major Bandy, the non-commissioned officer in charge of the Medical Holding Company, promptly called back to make sure that Hill was, in fact, calling from his parents' house. In addition, Etzel himself called Hill's parents' house to contact Hill or to leave messages for him. Finally, although Etzel did not examine Hill every seven days, Hill was nevertheless required to sign in once a week and hence make himself available for observation, if the doctor thought it necessary.

**2.** These medical findings of fact are based upon the credible expert testimony of Drs. Resnick and Sadoff.

**3.** See *supra* note 2.

30. Between January 8, 1991, and April 4, 1991, Hill had nine treatment sessions with Etzel. On each visit, Etzel found Hill to be stable, compliant with his medications, and without significant problems. During the formal mental status examinations performed by Etzel, the doctor met with Hill and made observations about a set of factors that afforded insight into Hill's condition. Among other things, Etzel observed and commented upon Hill's appearance, attitude, affect, orientation, memory, intelligence, and insight. Etzel also recorded observations regarding Hill's psycho-motor activity, namely his speech and thought processing and content. Finally, Etzel noted whether Hill suffered from any delusions or hallucinations, or experienced any homicidal or suicidal ideation. Etzel performed at least two complete mental status examinations. Although it is not clear from his notes whether Etzel performed more than two formal exams, the notes do reveal Etzel's conclusions that at each visit Hill appeared to be doing well. No evidence exists to show that Hill ever appeared manic, psychotic, or unable to care for himself; in other words, he appeared much better than he had at Wilford Hall or Hampton, when he was found to be a danger to himself and others.

31. On or about January 29, 1991, Hill returned to see Dr. Furr, the civilian psychiatrist who had treated Hill from late 1989 until July, 1990. On that date, Hill reported to Furr that he had been hospitalized by the Army, and that he was currently undergoing the medical board process. In his written progress notes, Furr found no evidence that Hill appeared psychotic, in distress, or otherwise in need of hospitalization.

32. Unbeknownst to Etzel or anyone else in the military, during the early part of 1991, Hill applied for and received a job offer from Hahnemann University Hospital in Philadelphia to be a resident in the psychiatry program. As part of the application process, Hill traveled to Philadelphia and interviewed separately with five psychiatrists who worked on Hahnemann's staff. During these interviews, Hill spent close to an hour with each psychiatrist in a one-on-one setting. One doctor rated him very highly; three others, including the chairman of the department, rated him a fair candidate; and the fifth strongly questioned his soundness for the position. Although not all the Hahnemann psychiatrists believed that he was the brightest or most qualified candidate, none of them rated Hill lower than fair when asked to grade: "How well put-together (psychologically) is the applicant?". Hill later attended a social function for prospective candidates and evidently impressed those in attendance. At the conclusion of the interviewing process, the department chairman directed that Hill be offered a psychiatric residency at Hahnemann. On or about February 14, 1991, Hahnemann formally extended its offer.

33. Hill accepted the offer and in late March, 1991, completed a licensing application and forwarded it to Hahnemann. He also signed and returned the employment agreement documents. Whereas Hill was unable to complete simple forms before his hospitalization at Wilford Hall, he was now evidently able to complete these Hahnemann forms and legal documents without difficulty.

34. Also in late March, 1991, Hill purchased two handguns from a gun shop in Virginia. The gun dealer who sold the firearms reported that Hill acted normally and did not exhibit signs of mental instability.[4] Hill completed the required federal forms, but lied about his prior hospitalization for mental illness and neglected to sign the forms. These errors and omissions were unfortunately not detected by the gun dealer at the time.

---

4. Indeed, far from appearing to be the by-product of confused or disoriented thought, Hill's purchase is of potential interest for the opposite reason. The gun dealer testified at trial that in early 1991, Virginia law did not require a background check for sales of handguns whose barrel length exceeded five inches. Because the two handguns Hill special ordered were longer than five inches, the nature of his purchase thus ensured that Hill would not have to undergo a background check. To the extent that Hill made his selection for that reason, his gun purchase is further evidence that in late March, 1991, he was not floridly psychotic, as he was during his earlier bouts of violence, but instead capable of exercising calculating and rational, if manipulative, thought.

35. Despite the fact that Hill brought the guns home and gave one to his father, Governor Hill, Hill's parents never expressed concern or contacted authorities for advice as they had done in 1989. Although Governor Hill actually had his son committed in 1989 for exhibiting bizarre and threatening behavior, including a fascination with guns and knives, the senior Hill never called anyone in March, 1991, to express concern about his son's purchase. Instead, the senior Hill apparently thought his son's mental illness was now under sufficient control such that his son could safely own the weapon. Therefore, the senior Hill took no efforts to hide or otherwise take the gun away from his son. Furthermore, Hill's parents were aware of their son's pending employment with Hahnemann Hospital and found nothing problematic with the situation. In fact, Hill's family indicated that they were proud of Hill's accomplishment and happy that he was putting his once promising life and career back together.[5]

36. In order to find an apartment for use during his residency, Hill traveled to Philadelphia and stayed with his cousin, Mildred Dickerson, and her husband, the weekend before Monday, April 8, 1991. Although Dickerson and her husband testified at Hill's criminal trial that Hill behaved eccentrically that weekend, they never indicated that he appeared violent or threatening.

37. On Monday, April 8, 1991, he met with Joyce Rosen of the Park Towne Place Apartments near the Hahnemann Hospital. Rosen showed Hill two apartments, and he selected and completed preliminary paperwork to rent a one-bedroom model. Hill did not appear strange or confused to Rosen, and he had the presence of mind to request the special discount that the apartment complex gave to Hahnemann doctors. According to Rosen, her meeting with Hill was pleasant and cordial.

38. Approximately one half hour later, while driving down a main thoroughfare in Philadelphia, Hill calmly double-parked his car. He exited his vehicle and walked up behind a group of four men who were walking along the Benjamin Franklin Parkway. Hill had never met these men, or had any dealings with them. Nevertheless, without warning or provocation, he opened fire, killing Peter Foy, and severely wounding John Senatore and Robert Dowe. The fourth man, Leonard Allen, dove behind some nearby shrubbery and avoided injury. Hill then calmly strode back to his car. After adjusting his mirror, he drove off.

39. Witnesses to the shooting described a cool, calculating, and deliberate killer. He did not rant, he was not out of control. He did not act manic or floridly psychotic, and hence exhibited none of the symptoms which had concerned his doctors at Wilford Hall or Hampton.

40. After the shooting, Hill drove back to his home in Virginia, where he was soon captured by police. Hill denied the crime, and concocted a story in which he admitted that he had been at the scene of the crime, but claimed that he knew nothing about the shooting and had sped off only because he had seen a man with a gun approach and try to enter his car.

41. Robert Williams, Chief Deputy Sheriff of Sussex County, Virginia, interrogated Hill for more than an hour soon after the arrest. According to Williams, Hill was dressed appropriately and was neat and clean. Hill had no trouble conversing with Williams, who thought his prisoner seemed calm, cooperative, and fully in control of his faculties.

42. The state of Pennsylvania tried Hill for his crimes in April, 1992. Although Hill pleaded not guilty by reason of insanity, the jury rejected his claim, instead finding him guilty but mentally ill. Hill received a life sentence for the first degree murder of Peter Foy, and three consecutive ten to twenty year sentences for the aggravated assaults of John Senatore, Robert Dowe, and Leonard

5. Although Mrs. Hill testified that Hill was acting strangely during the period in which he was being treated by Etzel at Fort Eustis, she evidently never felt as worried as she did in 1989, when she and her husband had Hill institutionalized. Moreover, this failure to share whatever concerns she may have had was one of her own making. She testified that Dr. Etzel often called her house asking to speak to her son. Although she thus had ample opportunity to talk directly to her son's treating psychiatrist about what she later claimed were his increasing eccentricities, she never made the effort to do so at the time.

Allen. Hill is currently confined within the Pennsylvania penal system.

43. In rendering its verdict, the jury rejected the argument that Hill did not know what he was doing. Instead, the jury accepted the viewpoint presented by psychiatric experts such as Dr. Robert Sadoff, who testified that, while Hill may have been mentally ill, he knew that what he was doing was wrong and that he could have stopped himself.[6] In other words, Hill's crimes were not the result of a mental disorder over which he had no control, but rather were the result of his own independent criminal act.

## CONCLUSIONS

In this action, John Senatore, Robert Dowe, and the Executrix of Peter Foy seek damages for wrongful death and personal injury allegedly resulting from defendant's failure to control Hill so as to prevent him from causing the harm to plaintiffs. They contend that defendant, through its various agents, knew or should have known that Hill's mental illness rendered him dangerous, and that accordingly defendant was under a duty to supervise, treat, and otherwise care for Hill in such a way as to prevent him from harming others. Plaintiffs further claim that defendant breached this duty by failing to provide appropriate psychiatric care or treatment for Hill, and that as a result Hill committed a criminal act against them. For the reasons set forth below, however, plaintiffs' claims must fail.

Plaintiffs bring this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–80. Since the wrong allegedly committed by the United States occurred at VA hospitals and military bases located in Virginia, the substantive law of Virginia governs this case. *See* 28 U.S.C. § 1346(b) (directing that the issue of liability on the part of the United States shall be determined "in accordance with the law of the place where the act or omission occurred").

■■■■ In Virginia, as elsewhere, there can be no liability for negligence unless the person who was negligent owed some duty to the party who seeks to hold him liable. *Fox*

*v. Custis,* 236 Va. 69, 372 S.E.2d 373, 375 (1988) (stating that "[t]here can be no actionable negligence unless there is a legal duty, a violation of the duty, and consequent damage"). As a general rule, there is "no duty to control the conduct of third persons in order to prevent harm to another. . . . This is especially the case when the third person commits acts of assaultive criminal behavior because such conduct cannot reasonably be foreseen." *Marshall v. Winston,* 239 Va. 315, 389 S.E.2d 902, 904 (1990).

The Virginia Supreme Court has recognized, however, that a "duty to protect one from the wrongful acts of a third party may exist because of a 'special relationship' between the defendant and the third party." *Nasser v. Parker,* 249 Va. 172, 455 S.E.2d 502, 503 (1995). Section 315(a) of the Restatement (Second) of Torts (1965) states the general rule as well as the special relationship exception:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct. . . .

*Id.; Fox,* 372 S.E.2d at 375 (quoting Restatement § 315(a)).

Section 319 of the Restatement (Second) of Torts (1965) then details the type of section 315(a) special relationship which plaintiffs argue applies in this case:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

*Id.; Fox,* 372 S.E.2d at 376 (quoting Restatement § 319); *see Nasser,* 455 S.E.2d at 504 (observing that courts must consider Restatement §§ 315(a) and 319 together when "determining whether one has a duty concerning the conduct of a third person").

Mindful of the established case law interpreting one's duty under these sections, the

---

**6.** Dr. Sadoff, who testified at Hill's criminal trial as well as in this civil trial, was a most credible witness. Moreover, of all the expert witnesses in this trial, Dr. Sadoff was the only one who had actually interviewed Hill.

parties agree that, in order to recover, plaintiffs must prove: (1) defendant "took charge of or exercised control over" Hill, *see Fox*, 372 S.E.2d at 376; (2) defendant did not exercise reasonable care in their treatment of Hill, *see Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 241 Va. 270, 401 S.E.2d 878, 880 (1991) (involving a halfway house which clearly did not exert reasonable care in controlling a convicted felon); and (3) Hill's crime and victims were reasonably foreseeable, *see id.* 401 S.E.2d at 883. Because plaintiffs failed to prove any of these factors, much less all three, their action must fail.

## I. Defendant did not "take charge of or exercise control over" Hill

█ Under Virginia law, a special relationship only exists between defendant and Hill if defendant "took charge of or exercised control over him" during the relevant time period. *Fox*, 372 S.E.2d at 376. In this case, no such relationship existed because, as of April, 1991, defendant did not exercise over Hill the type of control contemplated by the Virginia Supreme Court when it established the "take charge" standard.

In a series of decisions, the Virginia Supreme Court has described the type of relationship which must exist before a defendant can be said to have "taken charge of or exercised control over" another so as to create a section 319 "special relationship." In *Nasser v. Parker*, the court made clear that a doctor-patient or hospital-patient relationship, standing alone, does not constitute a special relationship nor create liability on the part of the medical care provider for the patient's actions.[7] 455 S.E.2d at 506. In that case, Edwards, a voluntary psychiatric inpatient with a history of mental illness and violent acts towards women who rejected him, made threats against Lemon, a former girlfriend who had just spurned him. Although his treating psychiatrist knew of his patient's violent history and recent threats, he made no attempt to prevent Edwards from checking himself out of the hospital, or to warn Lemon of Edwards' release. Two days later, Edwards murdered Lemon. *Id.* at 503.

In dismissing the suit brought by Lemon's father, the court held that merely accepting one as a patient and assuming responsibility for his proper treatment does not impose upon the medical care provider a duty to protect others from the patient's potential bad acts, even when the patient specifically warns that he intends to harm another. *Id.* at 506. Instead, the court specifically rejected the argument that the doctor "took charge of Edwards within the meaning of Restatement § 319 by accepting [him] as his patient for the purpose of providing prolonged treatment ..., prescribing medication ..., and arranging for [his] admittance to [the] Hospital." *Id.* (alteration in original) (quotation omitted). Additionally, the court declared that "[n]or do we think the hospital took charge of Edwards by accepting and admitting [him] as a patient for the purpose of providing continued and prolonged psychiatric treatment." *Id.* (alteration in original) (quotation omitted). In so ruling, the court set a high hurdle and suggested that some sort of custodial relationship, as would exist in a confinement setting, is required before section 319 liability can attach.

In two other decisions, the Virginia Supreme Court has likewise indicated that a defendant cannot be held to have taken charge of another, unless the defendant has some heightened obligation to monitor and direct the third party's movements. In *Fox v. Custis*, a parolee with a history of mental instability and violence went on a multi-week crime spree which culminated in arson, rape, and capital murder. During this time, the criminal's parole officers took no action to have their parolee reincarcerated; indeed, at the time, they had no knowledge of the seriousness of the criminal violations. 372 S.E.2d at 374. The assorted victims of the parolee's one-man crime wave sued the parole officers, asserting that they breached a duty imposed by section 319 to supervise properly former inmates. *Id.*

The Virginia high court rejected plaintiffs' arguments, holding that the parole officers owed them no such duty and were not liable for the parolee's actions. *Id.* at 377. Although the court recognized that the defen-

---

**7.** Similarly, plaintiffs can cite nothing to suggest that the mere existence of a military relationship creates a special relationship, and this court declines to so impose one.

dants had a statutory duty to "supervise and assist" their parolees, it stressed that "to 'supervise and assist' ... does not mean to assert custody in the sense that the parolee is in the personal care and control of the officer." *Id.* at 376. The court did, of course, recognize that a parolee's freedom is subject to special terms and conditions: "parolees ordinarily are essentially free to conduct their day-to-day affairs, adhering to specific rules and reporting certain activities to the parole officer as they occur or are planned." *Id.* Nevertheless, because "the applicable statute does not contemplate *continuing hourly or daily dominance and dominion,*" the court held that the defendants "did not take charge of or exercise control over [the parolee] within the meaning of accepted rules of tort law articulated in Restatement §§ 315(a) and 319." *Id.* (emphasis added).

The next case, *Dudley v. Offender Aid & Restoration of Richmond, Inc.,* 241 Va. 270, 401 S.E.2d 878 (1991), in which the court found that a special relationship did exist, contrasts neatly with *Fox* and serves to highlight the type of factors which must be present before a defendant can be found to have "taken charge" of another. In *Dudley,* Spencer, a felon serving time in a halfway house being negligently run by Offender Aid & Restoration of Richmond, Inc. ("OAR"), climbed out of the window of his room, broke into a nearby apartment, and raped and strangled Debbie Davis to death. *Id.* 401 S.E.2d at 880. In holding that the defendant-halfway house did owe Davis an actionable duty, the court emphasized that the case before it differed from *Fox* "in two crucial respects." *Id.* at 881. First,

> Spencer, unlike the parolee in *Fox,* had not served his period of confinement and had not been released into the community subject only to the "supervision and assistance" of parole officers. Rather, Spencer was a felon committed to the penitentiary and actively serving a sentence.... He was, when received by the OAR, in the custody of the Department of Corrections.

*Id.* The court made the determination of whether a special relationship existed very

simple by then declaring that "[a]nyone assuming that custody from the Department necessarily became 'one who takes charge' within the meaning of Restatement § 319." *Id.*

Second, the court found that OAR, under its contract with the Department of Corrections, "undertook a responsibility for very close and continuous supervision" of Spencer which "differed substantially, both in degree and in kind, from the duties imposed upon the parole officers in *Fox.*" *Id.* Specifically, OAR's contract required it to maintain stringent security and oversight measures. *Id.* In addition, OAR was supposed to have sufficiently effective sign-out procedures to enable it to report to the Department any unauthorized absence of an inmate in excess of two hours' duration. *Id.* 401 S.E.2d at 881–82. Given Spencer's status and the nature of OAR's contractual obligations, the court in *Dudley* declared that section 319's exception permitting liability, and not the general rule precluding it, applied. *Id.* at 882.

■ In contrast, given the nature of Hill's relationship with his medical care provider in April, 1991, defendant here cannot be said to have "taken charge" of Hill so as to become liable for his actions. Since Hill's release from Salem and during the course of his treatment by Dr. Etzel, defendant simply did not have the type of authority over Hill that the *Dudley* defendant had over its charges. Obviously defendant, like the parole officers in *Fox,* monitored Hill. Under Hill's treatment plan, he had to call in to Fort Eustis once a day, and check in once a week. In addition, he met with Dr. Etzel every ten days or so to discuss his plans, the course of his ongoing medical treatment, and his general condition. Moreover, although Hill violated the rule, he was also prohibited from traveling outside the Fort Eustis area without permission. In other respects, however, as in *Fox,* Hill's condition mandated that he be left "free to conduct [his] day-to-day affairs," 372 S.E.2d at 376, without the direct control of his doctors.[8] Unlike the felon in *Dudley,* Hill did not have to sign out whenever he left his house; so long as he stayed

---

8. As discussed more fully in Part II, *infra,* the applicable psychiatric standard of care required that Hill's doctors treat their patient in this less restrictive manner. Under that standard, defendant could not impose upon Hill a more restric-

within the general area, he was under no obligation to inform defendant about his daily activities. In any event, again as in *Fox*, defendant clearly did not exert "continuing hourly or daily dominance and dominion" over Hill. 372 S.E.2d at 376. Indeed, given Hill's status as an outpatient who lived at home, defendant had less intrusive control over the hourly and daily aspects of his life than the psychiatrist and hospital had over their psychiatric inpatient in *Nasser*, where the court still did not find the requisite "special relationship."

■ Plaintiffs' attempt to analogize this case to *Dudley* is simply unpersuasive and incorrect. Subject to military orders or not, Hill was a patient, not a prisoner. His mental illness in and of itself was a disease, not a crime. He was not serving a sentence at Wilford Hall or at Hampton, and his military doctors could not forcibly confine him once a reasonable medical determination was made, as it was in Hill's case in November, 1990, that he no longer appeared to be a danger to himself or to others. The "special relationship" required for liability did not exist between defendant and Hill, because defendant did not take charge of or exercise the requisite control over Hill during his treatment at Fort Eustis. As a result, defendant owed plaintiffs no duty to control Hill to prevent him from causing the harm that he did.[9]

## II. Defendant exercised reasonable care in its treatment of Hill

■ Even if plaintiffs had proven that defendant took charge of Hill, they still could

not recover because they cannot show that defendant's psychiatric treatment of Hill was negligent. Instead, the court concludes, based on a review of all the evidence and the court's resulting findings of fact, that defendant's treatment of Hill was reasonable and met the applicable standard of care.[10]

Plaintiffs do not contend that defendant can be found liable simply because it took charge of Hill. Instead, they recognize that the duty imposed by Restatement § 319 is not absolute, but only requires that one "exercise *reasonable* care to control the third person to prevent him from doing such harm." *Fox*, 372 S.E.2d at 376 (emphasis added). In an attempt to prove that defendant breached its purported duty to prevent Hill from harming them, plaintiffs struggled at trial to show that Hill's doctors at Salem and Fort Eustis negligently released him from inpatient status at Salem, misdiagnosed his illness, failed to prescribe proper medications, failed to check with collateral sources to determine whether Hill was compliant with his medications, and neglected to utilize the command and control environment of the military to order Hill into preventive detention.

Plaintiffs' arguments fall flat, and the testimony of their expert witnesses fails to persuade. Having heard all the evidence, the court agrees with the opinions of defendant's experts Drs. Resnick and Sadoff, as well as Dr. Lande, who testified that Hill's treatment at Salem and while assigned to Fort Eustis was within the applicable standard of care. As detailed below, the court concludes that all relevant aspects of Hill's diagnosis and

---

tive or intrusive treatment regime than his mental condition warranted.

**9.** Alternatively, to the extent that plaintiffs contend that defendant is liable because it negligently *failed* to take charge of Hill, they likewise do not state a viable cause of action. First, the evidence shows that defendant acted within the acceptable standard of care in treating Hill as it did. *See infra* Part II. Second, based on the Virginia authorities reviewed herein, this court concludes that a defendant in Virginia generally cannot be held liable for failing to take control over another; he can only be found liable for taking charge of another and then exercising that assumed control negligently. Possible exceptions to that rule, which may exist when a duty to control another is imposed by court order, *see Semler v. Psychiatric Institute of Washington,*

*D.C.*, 538 F.2d 121 (4th Cir.1976) (decided before the Virginia decisions discussed above), or by contract, *see Dudley*, 401 S.E.2d at 881, do not apply to the case at bar.

**10.** Virginia medical malpractice law provides that "[i]n any action for damages resulting from medical malpractice, any, issue as to the standard of care to be applied shall be determined by the jury, or the court trying the case without a jury." Va.Code § 8.01–581.20(B). Defendant, through its psychiatry and forensic psychiatry experts Drs. Lande, Sadoff, and Resnick, presented relevant, credible evidence concerning the applicable standard of care and how that standard interacts with such issues as predicting future dangerousness, all of which will be addressed herein. *See infra* Parts II and III.

psychiatric treatment were reasonable and appropriate.

■■■ As an initial matter, the court agrees with Dr. Lande, Director of the United States Military Forensic Psychiatry Program at Walter Reed Army Medical Center, who also teaches standard of care issues to army psychiatry residents, that military clinical practice is governed by the same principles as good civilian care. Therefore, the standard of care for psychiatrists practicing in VA hospitals and military bases located in Virginia is comparable to the standard of care for civilian psychiatric practitioners. This standard requires that the patient receive the least restrictive method of treatment appropriate under the circumstances. Without clinical justification, a treating physician cannot force a patient to take unwanted medications, nor can a doctor arbitrarily curtail a patient's liberty. The fact that a patient has been violent or has threatened violence in the past does not give his doctors carte blanche to lock him up or otherwise restrain him, unless the patient appears to be a danger to himself or others at the time.

In light of the applicable standard of care, the court finds that Hill's course of treatment at the Salem VA hospital, which culminated in his discharge as an inpatient, was reasonable. As described by Dr. Tellion, Hill's final treating psychiatrist at Salem, Hill's treatment team adjusted Hill's medications and employed "incentive therapy" whereby Hill gradually received increased freedom and reduced oversight as his condition improved. Doctors monitored Hill's improvement in progressively less restricted environments, until a decision was finally made that his condition did not warrant inpatient hospitalization.

The ultimate decision to discharge Hill from Salem as an outpatient following his dramatic improvement was reasonable and justified by Hill's medical condition at the time. As Dr. Resnick testified, a variety of factors support Salem's decision. For example, by late November, 1990, Hill was compliant with his treatment plan and had been taking his medication regularly for several weeks. Whereas Hill had to be transferred to Salem in restraints, his condition quickly improved and, by the time of his discharge, had stabilized. Hill performed well on his passes allowing him to leave hospital grounds, and he served competently as an assistant in the hospital library. Finally, following a successful pass to his home over the Thanksgiving holiday, Hill's family indicated that he was in the best shape he had been in since 1988. Based on their observations of Hill's improvement during his stay at Salem and mindful that they could not keep him confined longer than necessary, his treatment team acted reasonably in deciding that his condition no longer warranted inpatient hospitalization.

Moreover, Salem's prescribed medications for Hill were appropriate for one in his condition. As part of his discharge summary, Dr. Tellion diagnosed Hill as suffering from bipolar disorder and prescribed Loxitane, Klonopin, Symmetrel, and Synthroid. Klonopin, although not a classic mood stabilizer such as lithium, has mood stabilizing effects and thus may reasonably be prescribed to bipolar patients. Contrary to the arguments of plaintiffs' experts, Dr. Tellion's decision not to prescribe an injectable form of a neuroleptic medication was not negligent. In fact, use of such medications is rare and is not considered to be good practice if the patient appears stable and compliant.[11] Plaintiffs' experts also attempted to second-guess Dr. Tellion by suggesting that various other drugs which were not prescribed might have proved more effective. While the court agrees that other medications might have proved effective, it also recognizes that other medications might have had no effect whatsoever, or indeed may have imperiled Hill's health through adverse side effects or an allergic reaction. These foregone alternatives were not "sure things." The fact of the matter is that the medications prescribed by the Salem treatment team sparked a marked improvement in Hill, who progressed rapidly from a state of florid and uncontrollable psychosis to what his own family conceded was

---

11. The court respectfully declines to adopt the opinion, advanced by one of plaintiffs' experts, that it would be acceptable and indeed good practice for defendant to have ordered Hill, as an exercise of military authority, to be held down and forcibly injected with whatever drug his treating psychiatrist happened to consider appropriate at the time.

his best condition in years. Dr. Etzel then quite properly continued Hill on these same medications, regardless of his diagnosis.

Similarly, the court finds that Dr. Etzel's treatment of Hill upon his transfer to the Medical Holding Company at Fort Eustis met the applicable standard of care. Plaintiffs' attacks on Dr. Etzel's care are simply not persuasive. For example, the fact that Dr. Etzel disagreed with the Salem discharge diagnosis and instead diagnosed Hill with schizophrenia is of no real moment. As Drs. Sadoff and Resnick testified, and as the exhibits reveal, Hill's diagnosis seemed to change every time a psychiatrist examined him. In the course of two years of treatment, Hill's various psychiatrists diagnosed him alternatively with major depression, major depression with psychotic features, organic mood disorder, organic mental disorder, passive-aggressive personality disorder, schizophrenia (undifferentiated type), schizophrenia (disorganized type), bipolar disorder, schizoaffective disorder, organic mood disorder, bipolar disorder, and finally, Dr. Etzel's diagnosis of schizophrenia. The only diagnosis everyone, including Hill, could agree on was hypothyroidism.

To isolate Dr. Etzel's final diagnosis of schizophrenia as the one improper, negligent diagnosis among this host of conflicting diagnoses is arbitrary in the extreme. As Dr. Sadoff stated, these conflicting diagnoses do not indicate malpractice because psychiatry is not an exact science. A psychiatrist cannot order an x-ray to unravel the confused mysteries of human thought. Instead, the doctor must try to diagnose the illness by reading the symptoms. As the illness progresses through its stages and the symptoms wax and wane, a patient's diagnosis can change. Such a change need not, and in Hill's case does not, mean that one diagnosis is illegitimate or negligent.

In any event, whatever Hill's diagnosis, Dr. Etzel prudently chose to keep him on the same medications that sparked his recent improvement. This decision was not negligent, as these drugs can be used to treat schizophrenic as well as bipolar patients. Although plaintiffs contend that Dr. Etzel should have altered Hill's medications and perhaps prescribed an injectable medication, their arguments are unpersuasive, and are at best projections on a future that might have been. In psychiatry, as in other fields of human endeavor, it is prudent to stay with a successful course of action; if a treatment plan seems to be working, as Hill's was, there is no reason to change it. In support of this bit of common sense, defendant's experts noted that a psychiatrist should not switch a patient's medications unless the old medications do not work, or have unacceptably severe side effects. To switch drugs on a compliant, improving patient is inappropriate because the new medications are just as likely to be less effective as more so, and the untried medication may trigger severe side effects or an allergic reaction.

Similarly, the court is satisfied that Dr. Etzel's overall course of treatment of Hill, from December, 1990, until April, 1991, was reasonable and appropriate. Plaintiffs' attack on this front focuses on three issues: Dr. Etzel's decision to let Hill subsist at home, his supposed failure to conduct adequate mental status examinations, and his apparent failure to investigate Hill's compliance through collateral sources. As an initial matter, the court finds no negligence whatsoever in Dr. Etzel's decision allowing Hill to subsist at home. Given Hill's status in December, 1990, and in light of the standard of care which indicates that a patient who does not appear to be a danger to himself or others should be afforded the least restrictive method of treatment, Etzel's decision is reasonable and justifiable.

The court likewise finds nothing inappropriate with Dr. Etzel's treatment sessions with Hill.[12] Dr. Etzel conducted at least two

12. Much of plaintiffs' attack on Etzel centers on and feeds off of the issue of the quality of the doctor's notes, which the defendant's own experts conceded were not exemplary. Basically, plaintiffs argue that, because Dr. Etzel took inadequate notes, the court must assume that Etzel conducted inadequate therapy sessions. Plaintiffs' expert, Dr. Mansheim, contended that if it is

not written down, it did not happen. The court rejects that line of thought because it simply does not reflect human behavior or any applicable standard of care. The court believes that Dr. Etzel's skimpy notes are, in and of themselves, evidence of nothing more than that Dr. Etzel took skimpy notes. Notwithstanding their terse character, the progress notes support the finding

mental status examinations of Hill. On other occasions Etzel clearly conducted evaluations to assure the doctor that Hill's condition was stable. The standard of care does not require that a complete mental status examination be performed on every visit. Instead, such a formal exam need only be conducted intermittently, with somewhat less thorough but still probing evaluations performed in the interim to assure the doctor that the patient's condition has not changed. The frequency of the visits is a matter within the discretion of the treating physician. As Drs. Sadoff and Resnick agreed, this regimen, using less intrusive "supportive psychotherapy sessions" in conjunction with occasional formal mental status exams, was a reasonable way to treat a patient such as Hill.

These two experts also agreed that Dr. Etzel's decision not to conduct an invasive investigation into Hill's status and potential non-compliance with his medications through collateral sources (such as Hill's parents) was appropriate in this case. Drs. Resnick and Sadoff recognized that a patient's compliance with his medications is very important information which the treating psychiatrist should attempt to acquire. They simply made the point that assuming a patient, who otherwise appears cooperative and compliant, is a liar and not to be trusted is not the best way to build the long-term trust necessary in a healthy psychiatrist-patient relationship. Dr. Sadoff thus stressed that the best way to determine whether a patient such as Hill, who appears stable and compliant, actually is compliant is to observe his behavior during therapy sessions. Only if the patient then gives the psychiatrist some objective reason to conclude that he is not taking his medication should investigation through collateral sources occur. Because Hill never gave Dr. Etzel reason to conclude that he was non-compliant, Etzel was not negligent for failing to check with collateral sources. Moreover, Etzel did speak with Mrs. Hill, who never indicated any problems to Etzel.

Based on this and all the other evidence described above, the court finds that defendant was in no way negligent in its treatment of Hill. Instead, defendant's treatment of Hill, whether at Salem or after his transfer to outpatient status at Fort Eustis, was reasonable, appropriate, and within the standard of care.[13]

## III. Neither Hill's shooting spree nor his victims were reasonably foreseeable

Lastly, plaintiffs cannot recover because they cannot carry their burden and demonstrate that their injuries were reasonably foreseeable. Plaintiffs' failure is in two parts. First, they failed to prove that Hill's actions were foreseeable. Second, they cannot show that they fell within a class of foreseeable victims.

### A) Hill's Philadelphia shooting was not foreseeable

■ Under Virginia law, one who takes charge of another cannot be liable for the third person's actions unless the defendant "knew or should have known" that the third party was likely to cause harm. *Marshall v. Winston*, 239 Va. 315, 389 S.E.2d 902, 904 (1990). In *Marshall*, a sheriff and a jailor negligently released a prisoner from jail prior to the expiration of his sentence; the prisoner then robbed and murdered plaintiff's decedent. *Id.* 389 S.E.2d at 903–04. The original sentencing judge specifically expressed his concern that Mundy "might kill himself or a member of the public." *Id.* at 903. Notwithstanding the judge's concern or his sentence, the defendants mistakenly released Mundy from jail. Mundy was then arrested on an unrelated charge, placed back in defendants' custody, and promptly released five hours later. On April 8, 1987, while he should have been in jail serving his original sentence, Mundy robbed and murdered plaintiff's decedent. *Id.*

The Virginia Supreme Court agreed with the trial court that plaintiff's case had to be

---

that Dr. Etzel did conduct therapy sessions with Hill and recorded briefly his conclusions that Hill's physical and emotional status was stable.

**13.** Although defendant's treatment of Hill was reasonable, the court recognizes that, in hind-

sight, it is a natural reaction to second-guess Hill's doctors and argue that more restrictive methods and different medications should have been used.

dismissed. The court concurred that plaintiff failed to show that a section 319 special relationship existed because they did not allege facts "from which a person reasonably could infer that [defendants] knew or should have known that Mundy would likely cause bodily harm to others if he were not controlled." *Id.* at 904. The court's opinion suggests that although the judge might have had reason to know that Mundy might cause harm if not controlled, the defendants, who actually exercised control of the prisoner, lacked that knowledge. In ruling that the defendants were not liable, the court thereby provided that liability under section 319 can only attach if the one who takes charge of another has reason to suspect that the third person "would likely cause bodily harm to others if . . . not controlled." *Id.*

 Like the defendants in *Marshall*, defendant here is not liable for Hill's actions because it did not have reason to know that Hill was likely to carry out a murder and shooting rampage in Philadelphia in April, 1991. That independent criminal act was simply not foreseeable. First, as already discussed, Hill appeared to have stabilized while at Salem and continuing under Dr. Etzel's care. During his therapy sessions with Dr. Etzel, Hill did not appear psychotic, expressed no threats, explicitly denied homicidal ideations, and appeared to be compliant with his medications. In addition, Hill's parents, who purportedly witnessed some bizarre behavior, made no efforts whatsoever to inform defendant. Hill's mother testified that Dr. Etzel often called the house to ask for her son; at no time did Mrs. Hill take the opportunity to discuss Hill's condition. Accordingly, based on the information to which he had reasonable access, Dr. Etzel acted appropriately in concluding that Hill's condition had stabilized and that he was compliant with his medications and not decompensating.

Second, Drs. Resnick and Sadoff persuasively opined that predicting the future dangerousness of a psychiatric patient, such as Hill, is very difficult. Compliance with medi-

cation is not a guarantee that a patient will never relapse. Conversely, noncompliance does not assure a relapse. Instead, the most that can be said is that a noncompliant patient is more likely to relapse, and a patient who relapses in this situation is more likely to become violent. Defendant's experts also stressed that because not all violence is the result of a patient's illness, the threat of violence is not something that can be cured or prevented.

Finally, the court does not agree with plaintiffs that Hill had decompensated to a psychotic state, or that the Philadelphia shooting was a psychotic act. The court rejects plaintiffs' contention that "violence equals violence." Hill's violent act in Philadelphia was not foreseeable based on Hill's past actions because it differed in degree and kind from his earlier violence. Dr. Resnick testified that the April shooting was not foreseeable clinically because it was so unlike the psychotic eruptions that Hill had exhibited in the past. All of Hill's past violence had occurred when Hill, in a floridly psychotic state, lashed at those who attempted to restrain him or challenge his unrealistic view of his illness, such as the judge and sheriff's deputy involved in his commitment in 1989, and the medical personnel at Wilford Hall and Hampton. The Philadelphia shooting was quite different. Hill had never had any contact with plaintiffs, had never seen or spoken to them, and had never been restrained by them in any way. They were random victims.

More importantly, however, Hill was not in a psychotic state when he committed the crime. With the exception of certain of Hill's family members,[14] every witness who came into contact with Hill before and during the shooting testified that he appeared calm, acted normally, and in no way seemed confused or psychotic. Joyce Rosen was the last person to see Hill before the shooting. She described Hill as acting normally in every way while he viewed apartments with her and completed the paperwork to rent one.

---

**14.** While Hill's family did observe behavioral eccentricities in the months leading up to the shooting, a behavioral oddity is not *ipso facto* proof of psychosis. Although in 1989 they were so concerned about their son that they had him

committed, in 1991, Hill's parents evidently harbored no such fears and were, in fact, proud of their son's ability to secure a psychiatric residency in Philadelphia.

Similarly, every witness to the shooting agreed that Hill appeared to be a cool, calm, and calculating killer who did not seem to be "out of control" or psychotic. He even checked his rear view mirror before departing the scene. Finally, perhaps the most compelling evidence that Hill was not psychotic, at least as late as February, 1991, is the fact that he was hired as a psychiatric resident by Hahnemann University during that time period. Accordingly, the court concludes that defendant did not know or have reason to know that Hill would cause the harm he did in Philadelphia in April, 1991.

### B) Plaintiffs were not in a class of foreseeable victims

In Virginia, "[t]here is no such thing as negligence in the abstract, or in general.... Negligence must be in relation to some person." *Marshall*, 389 S.E.2d at 905. Accordingly, the Virginia Supreme Court has clearly stated that the duty imposed by Restatement § 319 "is not a duty to the world at large." *Dudley*, 401 S.E.2d at 883. While the scope of the duty "will vary with the circumstances of each case ... it is always a duty owed to a discernible individual, or to a class of which that individual is a member." *Id.* If the facts of the case are such that the third party is a "potential threat to all who come within his reach," then the section 319 duty extends to "an entire class of prospective victims: those who are directly and foreseeably exposed to the risk of bodily harm as a result of defendant's failure to control his dangerous charge." *Id.*

In this case, plaintiffs cannot show that they are part of a class which was "directly and foreseeably exposed" to risk of harm. In effect, plaintiffs' failure of proof is the result of a tension in the legal standard. On the one hand, the Virginia Supreme Court expanded the duty so that anyone who could reasonably be expected to come within harm's way is protected. On the other, the court did not want to expose those who take charge of others to open-ended liability to whomever may suffer injury. Thus, the court stressed that the duty was not owed to "the world at large," but only to reasonably discernable individuals or groups.

In order to show that defendant's duty extended to cover them, plaintiffs have to show some reason that defendant could reasonably have known that Hill would harm them. This plaintiffs have failed to do. Hill's earlier threats, which he made in the midst of a ranting, psychotic state, were not directed at plaintiffs, anyone associated with plaintiffs, or indeed anyone in Philadelphia. As stated, they were directed at individuals or a class of individuals seeking to restrain Hill in medical or legal settings. The only generalized threat Hill made was to drop a nuclear bomb on Minnesota or Montreal. From defendant's perspective, Hill had no apparent connection to Philadelphia. Moreover, Hill did not notify Etzel or anyone in the military of his upcoming residency in Philadelphia.

Unlike the felon in *Dudley*, who escaped from a halfway house in Richmond and killed someone in Richmond, Hill drove several hours across two states to get to Philadelphia. Any person en route had no less reason to expect an attack from Hill than did the four men who actually endured one. To extend defendant's duty to cover an area that large, when nothing Hill had ever said or done gave any hint of the harm he intended, would impermissibly extend defendant's duty to "the world at large."

—

The court is sympathetic to plaintiffs, who are without a doubt wholly innocent victims of an awful tragedy. However, based on the foregoing factual findings and legal conclusions, plaintiffs have failed to meet their burden of proof in this tragic case, and defendant is not liable for any injuries or damages plaintiffs have suffered. Accordingly, the court DIRECTS the Clerk to enter judgment for defendant in this case. The Clerk is also DIRECTED to send a copy of this Opinion and Final Order to all counsel of record.

It is so ORDERED.