The CINCINNATI, NEWPORT AND COVINGTON TRANSPORTATION COMPANY, a Corporation, Appellant,

v.

Burnet FISCHER, Appellee.

Court of Appeals of Kentucky.

June 1, 1962.

PALMORE, Judge.

The appellee, Burnet Fischer, a 27-year old lady employed as a comptometer operator by a firm of certified public accountants in Cincinnati, boarded one of appellant's motor buses at Dayton, Kentucky, on her way to work. After she paid her fare and started for a seat the bus jerked forward and threw her against a metal stanchion, resulting in a painful and permanent injury to her right thumb. She sued the transit company for negligence and got judgment in the amount of $5,083.83 pursuant to a jury verdict. The company appeals, claiming it was entitled to, and the trial court erred in refusing, each of the following:

(1) A directed verdict, upon the ground that it was neither pleaded nor proved that the jerk of the bus was "sudden, unusual, unnecessary and of sufficient violence to cause injury to her had she been exercising ordinary care for her own safety," and upon the further ground that plaintiff was contributorily negligent as a matter of law.

(2) A specific instruction on contributory negligence.

(3) Addition of the words, "in view of the mode of conveyance and other circumstances involved in this case," to the instruction outlining the duties of the bus company and its driver.

(4) An instruction on the theory of a defect in the brakes of the bus not theretofore known to the driver.

(5) An order setting aside the verdict as excessive.

We shall discuss these contentions in the order stated.

The allegation of negligence was that the bus company through its driver "did carelessly and negligently, without waiting for the plaintiff to be seated, cause said bus to start and lurch with such force and violence, that the plaintiff was caused to, and did, lose her balance, throwing her against the uprights and seats in said bus."

Stressing the words, "without waiting for the plaintiff to be seated," counsel for the

company says in effect that the cause of action was pitched on the theory that the negligence lay not in a sudden and unusual motion of the bus, but in starting it forward before the plaintiff took her seat, and that in the trial of the case she ought to have been confined to this theory. If so, the argument continues, defendant was entitled to a directed verdict under the authority of Dudley v. Blue Ribbon Lines Corp., 1949, 309 Ky. 308, 217 S.W.2d 629, and other cases holding that a carrier is not required to keep its car standing still until a passenger is seated.

■ "The true objective of a pleading stating a claim is to give the opposing party fair notice of its essential nature * * *." Clay, Kentucky Civil Rules, CR 8.01, Comment 2; Lee v. Stamper, Ky.1957, 300 S.W.2d 251. Although the expression "without waiting for the plaintiff to be seated" might well have been omitted from the complaint, we do not believe its inclusion could reasonably have been interpreted to mean that the plaintiff intended to rest her case on that one particular circumstance. It was plainly alleged that her injury was caused by a violent lurch of the bus, and this was sufficient to apprise the defendant of the essential nature of her claim.

■■ It has been said that in an action by a passenger against a carrier for injuries caused by a jerk or stop of the vehicle it must be both alleged and proved that it was sudden, unusual, unnecessary, and of such force as to import negligence on the part of the carrier. Chesapeake & O. R. Co. v. Hay, 1933, 248 Ky. 69, 58 S.W.2d 228, 230; Lyons v. Southeastern Greyhound Lines, 1940, 282 Ky. 106, 137 S.W.2d 1107. However, under the new rules of civil procedure adopted in 1953 it is not necessary to state a cause of action with the technical precision theretofore required. Clay, Kentucky Civil Rules, CR 8.01, Comment 2. This complaint was adequate to give the defendant fair notice and to identify the claim for purposes of res judicata. To require more would serve no useful purpose.

Passing now to the proof, Miss Fischer testified as follows:

"The bus gave a terrible lurch and I was headed for my seat and when it did, it threw me into the first metal upright pole and threw my thumb back and threw me into the long seat. * * * When I boarded the bus, I started for the first double seat on the right-hand side behind the bus driver and before I got there, the bus jerked and threw me into the right pole before I was able to grab hold of it or anything."

On cross-examination she further described the lurch in this way:

"Q—You didn't use any of the other chrome plated bars or stanchions between the front door and the seat?

"A—I didn't have a chance to. The jerk was too terrific."

The bus driver's version is reflected in the following excerpts from his testimony:

"I shut the door after she got on and said 'Good morning,' and stepped down on the gas and the brakes seemed to be holding. So I released them. As far as what was holding it, I don't know. Then I left off the brakes and stepped on the gas the brakes released and I went on.

"Q—Was there any unusual jerk of the bus when you started?

"A—All there was I noticed was the release of the brakes and I wouldn't say that would be a terrific jerk.

"Q—Was there any unusual jerk?

"A—It was a slight exception.

* * * * * *

"Q—Did it jerk you?

"A—I suppose it did give a slight jerk, yes, sir."

And under cross-examination:

"Q—But on this particular day, you did feel that bus jerk yourself?

"A—I said it jerked. I said it jerked but I don't know how much it jerked.

"Q—But it was an unusual jerk?

"A—Any time a brake holds, it's an unusual jerk.

"Q—You are sure the brakes held and released suddenly?

"A—I would say the brakes held and released, yes, sir.

"Q—And it wasn't the unusual [sic] motion of the bus?

"A—No sir, it wasn't the usual motion of the bus."

[redacted] The foregoing testimony proves conclusively that the movement of the bus was sudden and unusual. Though Miss Fischer could not have been more than three or four feet from the stanchion next to the front-row seat, she was thrown against it with such force that her thumb was severely injured, a circumstance mutely attesting the violence of the motion. "If the violence of the jerk or stopping is sudden and unusual in the course of the ordinary operation of the machine, or of such character that the jury may infer that it was unnecessary and was the result only of careless operation of the vehicle, the evidence will be deemed sufficient prima facie to establish negligence." Lyons v. Southeastern Greyhound Lines, 1940, 282 Ky. 106, 137 S.W.2d 1107, 1109. Where the plaintiff proves a sudden, violent, stop or jerk sufficient to cause injury, the jury has the right to infer that it was both unusual and unnecessary. Cincinnati, Newport & Covington Ry. Co. v. Rothe, Ky.1952, 252 S.W.2d 668. It is our opinion that the evidence in this case was amply sufficient to take it to the jury on the question of the driver's negligence.

It is next argued that Miss Fischer was contributorily negligent as a matter of law in that she failed to hold on to one or more of the stanchions or handrails as she made her way toward the seats and failed also to take the first available seat; and that in any event the company was entitled to a specific instruction on that theory of contributory negligence.

[redacted]

The bus had no other passengers when Miss Fischer boarded it. The first available seats were situated on opposite sides of the bus facing each other across the center aisle. They appear from a photographic exhibit to have been of sufficient width to accommodate two people each. From there on back the seats were arranged crosswise, two on a side with the aisle between. Stanchions in the form of upright metal poles, as well as an overhead handrail running fore-and-aft, were located on each side of the aisle. Proceeding from front to back, the first stanchion to the right was just past the driver's seat, and the next was beside the first crosswise row of seats, where Miss Fischer intended to sit.

In Dudley v. Blue Ribbon Lines Corp., 1949, 309 Ky. 308, 217 S.W.2d 629, a lady suffered a twisted knee when the bus in which she was a passenger started suddenly as she was going back through the bus to take a seat. Appealing from a judgment on a verdict for the defendant bus company, she complained of an instruction on contributory negligence because there was no evidence to support it. The court held that the giving of the instruction was proper, because all the seats were equipped with hand holds across their tops and there was no proof that she used them, from which the jury could have inferred that she failed to exercise ordinary care for her own safety.

Again, in Fisher v. Whitaker, Ky.1953, 260 S.W.2d 651, a similar case, a contributory negligence instruction was held proper in view of positive evidence that the plaintiffs had ample opportunity to use the overhead handrails but did not do so.

[redacted] The Dudley opinion does not disclose whether there was evidence showing that the plaintiff had a reasonable opportunity to use the hand holds. Presumably

there was. But insofar as the opinion holds that the jury could have inferred a failure to use the hand holds, without any evidence of such a failure, from the naked fact the plaintiff twisted her knee when the bus started, we are of the opinion that it is not sound and must be overruled. The burden was on the bus company to establish the issue of contributory negligence and, in so doing, to prove that the injured passenger (a) had a reasonable opportunity to utilize the protective devices and (b) failed to do so.

■ In the case before us there is no evidence of any probative substance that Miss Fischer had a reasonable chance to take hold of a stanchion or rail before the bus lurched forward. Though she said that the first thing she started to hold on to was the stanchion at the end of the first long seat, she explained her failure to use any of the other rails or bars by the flat statement that, "I didn't have a chance to. The jerk was too terrific." There was no evidence whatever to indicate how far she had proceeded, or how many steps she had taken, after depositing her fare. The fair import of the testimony of both Miss Fischer and the driver is that the accident took place almost at once, as she started toward the back of the bus. (Appellant's brief goes even further, saying that "there is no dispute that the bus started forward as soon as she was aboard and the door closed.") There was nothing, therefore, from which a jury could fairly have drawn the inference that Miss Fischer had a reasonable opportunity to take hold of any of the protective supports before she was thrown off balance.

■ We are unable to see any sound reason why, under ordinary circumstances, a passenger boarding a bus and rightfully relying on the driver to exercise due and proper care in operating it should be under any duty to sit in the nearest available seat. Except to the extent that it may have a bearing on the number and kinds of supportive devices that are available for his

protection as he passes along toward his chosen destination, whether he takes the first vacant seat is simply irrelevant. But even if this were not so, the same conclusion applies, because there was no evidence to indicate that Miss Fischer could have reached the first seat and sat down before the bus started, even if she had intended and tried to do so.

Thus it is our opinion that there was no error in the trial court's refusal to give a specific instruction on contributory negligence.

■ The instruction outlining the duties of the bus company and its driver was as follows:

"It was the duty of the defendant and its driver in charge of the bus in question upon which the plaintiff was a passenger to exercise the highest degree of care, skill and diligence for the safety of its passengers as was required by the nature and risk of the undertaking."

This was the same instruction as offered by appellant's counsel except for omission of the additional words, "in view of the mode of conveyance and other circumstances involved in this case." The authority on which it is claimed that this additional phraseology should have been employed is the following excerpt from Southeastern Greyhound Lines v. Woods, 1944, 298 Ky. 773, 184 S.W.2d 93, 95:

"It is quite generally stated as fundamental law that it is the duty of a common carrier to exercise the highest degree of care towards its passengers. The statement may be too general and broad. It may be more definitely stated as the duty to exercise the highest degree of care, skill and diligence for the safety of the passenger as is required by the nature and risk of the undertaking, in view of the mode of conveyance and other circumstances involved, which may vary according to the immediate activity, instrumentality, time or place."

That case did not, however, involve any question as to the form of instructions, nor was the foregoing dissertation intended as a statement of what an instruction must say. Our conclusion is that the expression "as is required by the nature and risk of the undertaking" would derive no further meaning or substance from the additional words "in view of the mode of conveyance and other circumstances involved" in this case, and that the given instruction was adequate.

■ With respect to the brakes, there was not enough evidence of a defect to warrant an instruction on unavoidable accident. The driver had been operating this particular bus for 5 months and had experienced no previous trouble. His statement that immediately prior to the accident "the brakes seemed to be holding," and that "the brakes held and released" was nothing more than a speculative conclusion, a mere guess. There was no evidence that this conjecture was confirmed by any further trouble of a similar nature, or by inspection of the braking mechanism of the bus. We think it is reasonable to assume that if in fact there had been a mechanical failure the company would have discovered it by subsequent inspection and proved it. The court properly declined to instruct on the theory of a defect. Cf. Chaney v. Slone, Ky.1961, 345 S.W.2d 484, 486.

The verdict gave Miss Fischer $5,083.83. Her total medical expense was $83.83. She did not claim lost wages. Thus she was awarded $5,000 for pain and suffering and for permanent impairment of her earning power. Her thumb was not broken, but very materially damaged nevertheless. As the bus proceeded toward Cincinnati the driver observed that she was crying, and when they reached the terminal there he saw that the thumb had swollen to double its normal size. She was not in condition to go on to work, and stayed aboard the bus on its return trip to her home at Dayton, Kentucky. She went immediately home and then to the hospital.

■ At the time of the trial, seven months after the injury, Miss Fischer still had pain in the thumb, and her physician testified that "she has about 50% loss of function of her right thumb. * * * and I believe it will be permanent." She suffered some sort of a temporary neck strain as well, and developed a rash from a nervous condition that may have grown out of the injuries. She was not hospitalized and, owing to the indulgence of her employers, apparently did not lose any wages. However, her efficiency in operating a comptometer is permanently impaired because she can no longer hold a pencil with her thumb while operating the machine. This technique speeds the operation of recording the data as it is computed on the machine. Miss Fischer now finds it necessary to pick up the pencil after striking her total on the comptometer, write the total down, and then lay the pencil aside before operating the machine again. She devotes 50% of her time to this particular type of work. Her supervisor testified that "there has been a material lessening in her agility [sic] to operate the equipment that is her primary duty," but that she has been kept on by the company out of a sense of loyalty. Her life expectancy is a little over 40 years.

In Cincinnati, Newport & Covington Ry. Co. v. Rothe, Ky.1952, 252 S.W.2d 668, this court affirmed an award of $7,500 to a 68-year old housecleaner for a badly bruised arm, elbow, foot and ankle, with permanent injury to the ulnar nerve of an arm resulting in partial paralysis. The award in the case before us today may have been liberal, but we cannot say it is plainly excessive.

Judgment affirmed.