CONSTANCE P. FOX, ET AL.

V.

ROY S. CUSTIS, ET AL.

Record No. 850942

September 23, 1988

Present: All the Justices

*Stephen K. Fox (Fox & Proffitt, P.C.,* on brief), for appellants.
*Peter R. Messitt, Assistant Attorney General (Mary Sue Terry, Attorney General; Gail Starling Marshall, Deputy Attorney General; James T. Moore, III, Senior Assistant Attorney General,* on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

This appeal is from an order in three consolidated damage suits brought against state parole officers arising from crimes committed by a parolee. We determine whether the trial court erred in sustaining demurrers to the several amended motions for judgment.

■ Because the cases were decided on demurrer, we will consider the allegations pursuant to the settled rule that a demurrer admits the truth of all well-pleaded material facts. All reasonable factual inferences fairly and justly drawn from the facts alleged must be considered in aid of the pleading. However, a demurrer does not admit the correctness of the pleader's conclusions of law. *Ames* v. *American National Bank,* 163 Va. 1, 37-38, 176 S.E. 204, 215-16 (1934).

In January 1976, one Morris Odell Mason was convicted in the court below of arson and grand larceny. He was sentenced to 20 years in the penitentiary, with 10 years suspended. Mason was paroled in April 1978 and he returned to Northampton County. Defendants Roy S. Custis and John R. Chandler, Jr., employees of the Virginia Department of Corrections, Division of Probation and Parole Services, were assigned to supervise Mason's parole. Custis was the parole officer and Chandler was the Chief Probation and Parole Officer for the district.

According to the allegations, defendants had actual and constructive knowledge of Mason's mental instability, his general reputation for committing acts of arson, his sexual aberrations, his

recidivist behavior, and his other violent and antisocial tendencies. This knowledge, according to the allegations, required defendants to supervise Mason strictly to insure compliance with the terms of his parole because he was an extreme danger to the community.

During the first two weeks of May 1978, the following incidents involving the parolee occurred in Northampton County. On May 1, the parolee defrauded an innkeeper, a misdemeanor, violating his parole. On May 2, defendants learned of this offense. On May 3, according to plaintiffs, defendants acquired knowledge that on May 1 the parolee committed other offenses in violation of parole terms, such as, consuming alcoholic beverages to excess and making improper sexual advances to women. In addition, defendants "suspected," according to the allegations, that the parolee had committed an act of arson on May 1 which resulted in a woman's death.

On May 8, the parolee was convicted of the misdemeanor and sentenced to a jail term, which was suspended, and fined $25. On May 10, defendant Chandler wrote the parolee advising that his misdemeanor conviction constituted a violation of a condition of his parole. The letter stated that defendant Custis "has recommended that you be continued on parole and is willing to assist you." Chandler warned the parolee that any further parole violations would result in revocation of parole and reincarceration to serve the remainder of his sentence. At the time, Code § 53-250(4) (Repl. Vol. 1978), now § 53.1-145, dealing with the functions, powers, and duties of probation and parole officers, provided that such officers "shall . . . [a]rrest, and recommit to the place of confinement from which he was released, . . . for violation of the terms of probation or parole, any probationer or parolee under his supervision, . . . pending a hearing . . . ."

On May 14, the parolee committed the offenses generating these tort actions. The dwelling house of plaintiff Constance P. Fox was destroyed by a fire intentionally set. Plaintiff Lisa Morris was abducted, beaten, raped and set on fire. Plaintiff Wendy F. Morris was shot, stabbed, and otherwise attacked.

It later developed that the parolee had committed a capital murder on May 13, for which he was convicted and sentenced to death. *Mason v. Commonwealth*, 219 Va. 1091, 254 S.E.2d 116, *cert. denied*, 444 U.S. 919 (1979).

These actions, filed in 1981 in two counts, sought compensatory and punitive damages. Under state law, plaintiffs alleged defen-

dants were guilty of negligent, willful, wanton, and reckless conduct in violation of their "statutory duty" to arrest, and in violation of their general duty to "exercise a reasonable degree of care in supervising" the parolee "to prevent a foreseeable high degree of risk of harm to the person and property of others." The actions also sought recovery under the provisions of 42 U.S.C. § 1983, a part of the Civil Rights Act of 1871.

Upon petition of defendants, the actions were removed to the United States District Court for the Eastern District of Virginia, Norfolk Division. In 1982, the federal district judge dismissed the plaintiffs' complaints. He ruled, as to the state law claims, that the defendants were protected by sovereign immunity and, as to the federal claims, that plaintiffs had "failed to state a claim cognizable under § 1983."

On appeal, the United States Court of Appeals, Fourth Circuit, affirmed the dismissal of the plaintiffs' § 1983 claims, *Fox* v. *Custis*, 712 F.2d 84 (4th Cir. 1983), relying on *Martinez* v. *California*, 444 U.S. 277 (1980) (plaintiff's decedent, a young girl, murdered by parolee five months after release from prison despite history of sex offenses). But the court reversed the district court's ruling on the state-law claims and directed remand of the cases to the state court. The court held that once the district court dismissed the § 1983 claims on the merits the appropriate course would have been for the district court, in an exercise of discretion, to remand the plaintiffs' state claims to the state court for adjudication. 712 F.2d at 89-90.

Upon remand to the state court, the trial judge sustained defendants' demurrers, which had been filed previously, holding that defendants were shielded from liability by the doctrine of sovereign immunity. We awarded plaintiffs this appeal from the trial court's 1985 order dismissing the actions.

On appeal, the parties debate a number of issues including quasi-judicial immunity, sovereign immunity, and proximate cause. We do not reach any of those questions, however, because another issue, also debated by the parties, is dispositive.

In a negligence case, neither the issues of proximate cause nor the immunity defenses become germane until it has been established that a defendant owes to a plaintiff a duty of care which has been breached. There can be no actionable negligence unless there is a legal duty, a violation of the duty, and consequent damage. *Chesapeake and Potomac Tel. Co.* v. *Dowdy*, 235 Va. 55, 61,

365 S.E.2d 751, 754 (1988); *Trimyer v. Norfolk Tallow Co.*, 192 Va. 776, 780, 66 S.E.2d 441, 443 (1951). Therefore, the threshold question in this case is whether a duty of care existed on the part of these defendants to these plaintiffs. This is a pure question of law. *Chesapeake and Potomac Tel. Co. v. Bullock*, 182 Va. 440, 445, 29 S.E.2d 228, 230 (1944).

Ordinarily, a person has no duty to control the conduct of third persons. The principle is set forth in the Restatement, relied on by the parties to this litigation, as follows:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection." Restatement of Torts (Second) § 315 (1965).

*See* Prosser and Keeton, The Law of Torts, § 56 at 383-85 (5th ed. 1984). We recognized this rule in deciding the question whether a landlord owed a duty to protect a tenant from the criminal act of an unknown third party in *Gulf Reston v. Rogers*, 215 Va. 155, 158, 207 S.E.2d 841, 844 (1974), and in *Klingbeil Management Group Co. v. Vito*, 233 Va. 445, 447-48, 357 S.E.2d 200, 201 (1987). We also discussed the rule in *Wright v. Webb*, 234 Va. 527, 530, 362 S.E.2d 919, 921 (1987), when considering the question whether an owner or possessor of land is under a duty to protect invitees from assaults by third parties while the invitee is on the premises. In that case, however, we declined one party's request that we adopt an exception, expressed in § 314A of the Restatement, to another rule stated in § 314 ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action"). 234 Va. at 530, 362 S.E.2d at 920-21.

Section 315(b) is not apposite because no special relationship existed between the Department of Corrections, or its employees, and these plaintiffs. "The claimants here were simply members of the general public, living in the free society, and hav-

ing no special custodial or other relationship with the state." *Fox v. Custis*, 712 F.2d at 88. The special relationships mentioned in § 315(a) are detailed in Restatement §§ 316-319.

Section 319 is applicable and provides, "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." In the present case, we must decide if a § 315(a) special relationship existed between defendants and Mason, that is, whether the defendants took charge of or exercised control over him.

■ Although one defendant is alleged to have been the supervisor of the other, we will assume for purposes of this discussion that both acted as "the" parole officers for Mason. According to statute, a parole officer must "[s]upervise and assist all persons within his territory released on parole." Code § 53-250(3) (Repl. Vol. 1978), now § 53.1-145(3). The relationship between the parolee and officer is usually continuing because parole normally is for an extended period of time. But to "supervise and assist" during this period does not mean to assert custody in the sense that the parolee is in the personal care and control of the officer. While the record does not show the terms and conditions of Mason's parole, parolees ordinarily are essentially free to conduct their day-to-day affairs, adhering to specific rules and reporting certain activities to the parole officer as they occur or are planned. The applicable statute does not contemplate continuing hourly or daily dominance and dominion by a parole officer over the activities of a parolee.

■ Therefore, we hold that the defendants did not take charge of or exercise control over Mason within the meaning of accepted rules of tort law articulated in Restatement §§ 315(a) and 319. *See Small* v. *McKennan Hospital*, 403 N.W.2d 410 (S.D. 1987) (parole officer for parolee placed on maximum supervision status did not "take charge" of parolee so as to impose liability upon officer when parolee abducted woman from parking lot, raped, and murdered her); *Lamb* v. *Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985) (probation officer did not "take charge" of probationer so as to establish duty to parents of child injured in auto accident by intoxicated probationer who had known propensities to drive while drunk). *See also Seibel* v. *City and County of Honolulu*, 61 Haw. 253, 602 P.2d 532 (1979). Hence, no special relationship existed

between defendants and Mason which imposed a duty upon them to control his conduct to prevent him from causing harm to persons or property.

We have studied the cases cited by the plaintiffs, all of which factually are inapposite and require no further comment. We will address, however, *Semler* v. *Psychiatric Institute of Washington, D.C.*, 538 F.2d 121 (4th Cir.), *cert. denied sub nom. Folliard* v. *Semler*, 429 U.S. 827 (1976), upon which plaintiffs mainly rely. There, the court of appeals affirmed the district court's judgment against a psychiatric facility, a physician, and a Virginia probation officer in a suit for damages brought by a mother for the death of her daughter who was killed by one Gilreath, a Virginia probationer. Pending trial on an indictment for abducting a young girl, Gilreath entered the facility for psychiatric treatment. Relying on the physician's opinion that Gilreath did not pose a danger to himself or others as long as he was supervised in a structured environment at such a facility, the trial judge, upon Gilreath's guilty plea, suspended his 20-year sentence. The judge ordered that the suspension was conditioned on Gilreath's continued confinement and treatment at the facility. About a year later, Gilreath was discharged from the facility and the physician placed him on outpatient status. The probation officer was aware of this new arrangement but did not report it to the judge. Several months later, Gilreath killed the plaintiff's daughter.

The court of appeals held that the court order requiring the probationer to remain confined created a special relationship and imposed a duty on the facility, the doctor, and the probation officer to exercise reasonable care to protect the public from harm at Gilreath's hands. Relying on § 319 of the Restatement, the court said that the standard of care had been "delineated by the precise language of the court order" requiring Gilreath to remain in custody until released by further court order. 538 F.2d at 125. *See A.L.* v. *Commonwealth*, 402 Mass. 234, 521 N.E.2d 1017 (1988) (conditions of probation imposed by sentencing judge created a special relationship between the probation officer and middle school students injured when molested by convicted child molester employed as a teacher at school).

In the present case, the plaintiffs equate the court order in *Semler* with what they say is the mandate of Code § 53-250(4), *supra*, providing that probation and parole officers "shall . . . [a]rrest, and recommit . . . for violation of the terms of probation

or parole, any probationer or parolee under his supervision . . . ." Plaintiffs argue that once the defendants became aware that Mason had violated the terms of his parole, they were under a legislative command, like the judicial command in *Semler*, to arrest and reincarcerate Mason, thereby creating a special relationship giving rise to a duty of reasonable care. We do not agree.

We need not decide whether *Semler* correctly applies the law of Virginia because that case also is inapposite. There is a vast difference between the force of the court order in *Semler*, requiring Gilreath to be retained in custody in a psychiatric facility until released by further order, and the responsibilities imposed by § 53-250(4) upon the parole officers in this case. The statutory provision, using the word "shall," does not require a parole officer to arrest and reincarcerate, pending a hearing, every parolee who violates a condition of parole, however minor. In the sense used in that statute, the word "shall" is merely directory in meaning and not mandatory. Courts, in endeavoring to arrive at the meaning of language in a will, contract, or a statute, often are compelled to construe "shall" as permissive in accordance with the subject matter and content. *Huffman* v. *Kite*, 198 Va. 196, 202, 93 S.E.2d 328, 332 (1956). This is such a case. Any other interpretation of the word would be unrealistic and would be contrary to the obvious intention of the General Assembly.

Therefore, the defendants had discretion whether to arrest Mason after receiving information about his May 1-3 activities. They decided not to act and from hindsight the decision tragically was wrong. Nevertheless, no special relationship had been created under these circumstances that would have imposed a duty upon defendants to control Mason's actions, thus protecting these plaintiffs from harm at Mason's hands.

For these reasons, the judgment of the trial court dismissing these actions will be

*Affirmed.*