**GRAND AERIE FRATERNAL ORDER OF EAGLES, Appellant**

v.

Marlene **CARNEYHAN**, Administrator of the Estate of Jamie Lee Carneyhan; William E. Carneyhan, Individually; and Marlene Carneyhan, Individually, Appellees.

No. 2003–SC–0169–DG.

Supreme Court of Kentucky.

Aug. 25, 2005.

Mark A. Osbourn, Carol Schureck Petitt, Schiller, Osbourn & Barnes, Louisville, KY, Counsel for Appellant.

David F. Broderick, Broderick & Thornton, Bowling Green, KY, Counsel for Appellees.

Opinion of the Court by Justice COOPER.

Appellant, Grand Aerie Fraternal Order of Eagles ("the Grand Aerie"), is a national fraternal organization, with local chapters chartered throughout the United States and Canada. One such chapter, Canton Aerie 4313, was located in Trigg County, Kentucky, a dry territory in which the sale of alcohol is prohibited. KRS 242.230. On the night of April 3, 1994, Jamie Lee Carneyhan, nineteen years of age, consumed alcoholic beverages while attending a social function on premises leased by Aerie 4313. Later that night, she was killed in a single-vehicle collision in Trigg County. The administrator and her parents individually ("the Carneyhans") filed suit against the Grand Aerie, Aerie 4313, and Michael Thomas, a member of Aerie 4313 who allegedly served alcohol to the decedent.

The Trigg Circuit Court granted partial summary judgment in favor of the Grand Aerie, finding that (1) the Grand Aerie's constitution created no contractual obligation for it to directly supervise, control, or regulate its local chapters; and (2) no principal-agent relationship existed between the Grand Aerie and its local chapters as would impose vicarious liability upon the Grand Aerie for Aerie 4313's negligence under a theory of respondeat superior. After the Grand Aerie's dismissal from the action became final, the Carneyhans appealed the partial summary judgment. The Court of Appeals agreed with the trial court that there was no agency relationship between the Grand Aerie and its local chapters, thus concluding that, as a matter of law, the Grand Aerie could not be held vicariously liable for the negligence of Aerie 4313. The Carneyhans do not contest that decision of the Court of Appeals. The Court of Appeals also held, however, that the Grand Aerie created for itself a duty to supervise its local chapters' alcohol sales. The Court of Appeals thus concluded that the Grand Aerie could be liable to the Carneyhans for its own negligent supervision, reversed the partial summary judgment, and remanded the case for further proceedings against the Grand Aerie. We granted discretionary review and now reverse the Court of Appeals and reinstate the summary judgment of the Trigg Circuit Court.

## I. SUFFICIENCY OF THE PLEADINGS.

At oral argument, the Grand Aerie's attorney asserted, for the first time, a contention that the Carneyhans had not properly pled a negligent supervision claim against the Grand Aerie. The Carneyhans' verified complaint filed in the Trigg Circuit Court alleged *inter alia:*

VII. On April 3, 1994 these Defendants [the Grand Aerie, Canton Aerie 4313, and Thomas], were acting as an unlicensed vendor and trafficking in alcoholic beverages in a dry county on the property describe[d] above. Defendants, in a dry territory, unlawfully sold, bartered, loaned, gave procured or furnished another or kept or transported for sale, bartered or loaned, directly or indirectly, alcoholic beverages at the location known as "The Eagles".

VIII. Defendants served alcoholic beverages to Plaintiffs' decedent, Jamie Lee Carneyhan, who was under the legal drinking age of twenty-one (21) years old in violation of KRS 244.080(1). Defendants continued to serve alcoholic beverages to Plaintiffs' decedent, Jamie Lee Carneyhan, although a reasonable person under the same or similar circumstances, should have known, that Plaintiff's decedent was already intoxicated at the time of serving.

IX. Upon leaving the premises owned by Defendants on April 3, 1994, Plaintiffs' decedent, Jamie Lee Carneyhan, then proceeded to operate her 1988 Pontiac Firebird automobile and as a direct and proximate consequence of this overconsumption of alcoholic beverages while at "The Eagles," Plaintiffs' decedent's automobile collided with a utility pole while traveling north on Kentucky 128. Plaintiffs' decedent, Jamie Lee Carneyhan, was killed in the collision.

X. The acts or omissions of the Defendants constitute negligence which was a substantial factor in causing or contributing to cause the wrongful death of Plaintiffs' decedent, Jamie Lee Carneyhan, on April 3, 1994.

XI. At all times mentioned herein, the Defendant, Grand Aerie Fraternal Order of Eagles, was directly supervising, controlling and regulating the actions or omissions of the local branch of the Fraternal Order of Eagles, Canton Aerie 4313 that was in existence on April 3, 1994.

■ Civil Rule (CR) 8.01 requires pleadings to contain "a short and plain statement of the claim showing that the pleader is entitled to relief...." It is not necessary to state a claim with technical precision under this rule, as long as a complaint gives a defendant fair notice and identifies the claim. *Cincinnati, Newport & Covington Transp. Co. v. Fischer*, 357 S.W.2d 870, 872 (Ky.1962). This principle fully applies to negligent supervision claims:

> As for actions based on the direct negligence of the employer, as long as the complaint generally alleges an employer's negligence, it does not have to individually identify the employees upon whose negligence the employer's liability is based. Otherwise, the plaintiff must allege that the defendant knew or had reason to know of the employee's harmful propensities; that the employee injured the plaintiff; and that the hiring, supervision, or retention of such an employee proximately caused the plaintiff's injuries.

27 Am.Jur.2d *Employment Relationship* § 401 (2004).

■ Applying these principles to the case *sub judice*, we conclude that the Carneyhans' complaint sufficiently alleged a theory of negligent supervision. The complaint alleged that the Grand Aerie had reason to know of Aerie 4313's harmful propensities; indeed, Paragraphs VII and VIII of the complaint alleged that the Grand Aerie participated with Aerie 4313 in the ostensibly unlawful and negligent activities. Paragraph IX, and subsequent paragraphs alleging damages, stated that Aerie 4313 injured the Carneyhans by causing the decedent's over-consumption

of alcohol and, proximately, her collision and death. Finally, the allegations in Paragraphs VII and VIII discussed above, when added to Paragraph XI's allegation that the Grand Aerie supervised Aerie 4313's actions and Paragraph X's general allegations of causation and negligence, were sufficient to state a claim that the Grand Aerie's supervision and retention of Aerie 4313 proximately caused the Carney-hans' injuries. "All that our procedure presently requires is that the Complaint set out 'facts or conclusions . . . sufficiently to identify the basis of the claim.'" *Natural Res. and Env't. Prot. Cabinet v. Williams,* 768 S.W.2d 47, 51 (Ky.1989) (quoting Clay, *Kentucky Practice,* 3d ed., Rule 8.01, at 133–34). The Carneyhans' complaint was sufficient, under CR 8.01 and our decisions applying it, to allege a negligent supervision theory.

## II. DUTY TO SUPERVISE.

Several former members of Aerie 4313 testified in their depositions that the Grand Aerie chartered Aerie 4313 in 1991. As is the case with each of the Grand Aerie's local chapters, Aerie 4313 operated with a high degree of autonomy. The Grand Aerie, in its constitution, disclaimed responsibility for the acts and omissions of its local chapters and, in its by-laws, disclaimed supervision and control of its local chapters. While the Grand Aerie required payment of a "per capita tax," and gave general guidelines about the organization of chapters and the qualifications of members, local chapters could otherwise charge dues, operate, and admit members, as they saw fit. The former members of Aerie 4313 testified that this autonomy included operation of its "social room." Aerie 4313 held social events at the discretion of its members, and the proceeds from these events remained with the local chapter. The Grand Aerie owned no interest in the property on which these events were held.

Three members of Aerie 4313 owned the property and leased it to the local chapter.

■ It is undisputed that Aerie 4313 unlawfully sold alcoholic beverages in Trigg County at least until local law enforcement officials raided the chapter in October 1992. Thereafter and on April 3, 1994, the chapter, according to its former members, operated on a "bring your own bottle" basis, selling only ice and materials for mixed beverages and charging a fee for bringing alcohol onto the premises. However, several witnesses who were present with the decedent on the night in question testified that they purchased alcohol from members or employees of Aerie 4313. As this case is on appeal from a grant of summary judgment to the Grand Aerie, we view this disputed fact in a light most favorable to the Carneyhans. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky.1991).

The Carneyhans' theory of liability is that the Grand Aerie's failure to exercise reasonable care in supervising Aerie 4313 allowed the local chapter to unlawfully sell alcohol in a dry county, to unlawfully serve alcohol to the underage decedent, and to negligently serve alcohol to the already-intoxicated decedent. To establish that the Grand Aerie had a legal duty to exercise reasonable care in supervising Aerie 4313's alcohol-related activities, the Carneyhans rely upon our precedent regarding a "universal duty of care," and upon provisions of the Grand Aerie's constitution and statutes, as well as materials distributed by the Grand Aerie to its local chapters. We will first address the Grand Aerie's constitution, statutes, and materials distributed to its local chapters, as they present a separate question of whether the Grand Aerie voluntarily assumed a duty to supervise its local chapters.

### A. Assumption of Duty.

■ Among the resources given by the Grand Aerie to each of its local chapters is a fifty-three page officers' handbook containing numerous and varied guidelines to aid in the efficient operation of a local chapter. One of those fifty-three pages discusses the profitable sale of alcoholic beverages. The page includes four charts, each detailing the amount of revenue that can be garnered from a single bottle of alcohol depending upon variances in the size of the glass used and the price per glass. The last paragraph of the page summarizes the purpose for its inclusion in the handbook:

> REMEMBER ... PROFIT is the last portion of the bottle you pour. Be sure you receive the required number of drinks from each bottle, with money in the register. The size of your shot glass determines the number of drinks served from the bottle. The Steward must realize that every drink not paid for, or over-pouring, reduces the NET PROFIT—the justification of employment.

The Court of Appeals seized upon the contents of this page to conclude that the Grand Aerie used the officers' handbook to encourage or induce the sale or service of alcoholic beverages by Aerie 4313. Because of this alleged encouragement or inducement, the Court of Appeals held that the Grand Aerie had assumed for itself a duty to supervise Aerie 4313's alcohol-related activities. We disagree.

The Grand Aerie distributes the same handbook to the officers of each of its local chapters, irrespective of whether the local chapter actually serves alcohol or not. The guidelines contained throughout the fifty-three page handbook amply demonstrate the handbook's purpose: to provide advice regarding the efficient operation of a local chapter. The page discussed above is the only provision in the entire handbook, or in the other materials distributed by the Grand Aerie to its local chapters, that discusses the sale or service of alcohol. The page, itself, contains no language of encouragement or inducement. Rather than advising local chapters to sell or serve alcohol, the page merely provides, to those local chapters that have already chosen to sell alcohol, information about how to engage in this practice profitably. We decline to hold that advice on how to operate at a profit is an inappropriate subject matter for inclusion in a manual providing guidelines for the efficient operation of an organization. Finally, because the Grand Aerie receives no portion of the revenues stemming from its local chapters' social events, it likely has little or no interest in whether its local chapters actually engage in the sale or service of alcohol. We therefore hold that the Grand Aerie's inclusion of this page in the handbook given to its local chapters did not create a duty to supervise Aerie 4313's alcohol-related activities. *See Foster v. Purdue Univ. Chapter, The Beta Mu of Beta Theta Pi,* 567 N.E.2d 865, 872 (Ind.Ct.App.1991) (national fraternity's communication with local chapters warning against alcohol abuse did not constitute a gratuitous assumption of duty to control local members' alcohol consumption).

■ The Carneyhans also rely upon provisions of the Grand Aerie's constitution and statutes in support of their theory that the Grand Aerie voluntarily assumed a duty. In particular, the Carneyhans cite Section 9.7 of the Grand Aerie's statutes, which states:

> *Except as otherwise provided by the Constitution and Statutes of the Order and not in conflict therewith,* the Board of Grand Trustees shall have the power and be charged with the following additional duties:
>
> . . .

(e) To examine into the condition of all Local Aeries with a view of determining whether they have complied with the Laws of the Order and are worthy of their Charter.

(Emphasis added.) To give content to the meaning of subsection (e), the Carneyhans point to Section 39.2 of the same statutes, which provides:

The Charter of a Local, State or Provincial Aerie may be suspended or revoked for any one of the following causes:

. . .

(c) Upon good cause shown that the Local Aerie has violated local, state, or federal laws, or otherwise engages in conduct which is contrary to the best interests of the Fraternal Order of Eagles.

In other words, the Carneyhans argue that the Grand Aerie assumed for itself a supervisory duty to ensure compliance by its local chapters with federal, state, and local laws. However, this interpretation is based upon an incomplete reading of the Grand Aerie's statutes. Section 9.7 expressly states in its opening language that it is subject to other provisions of the Grand Aerie's constitution and statutes. Section 89.10 specifically and directly discusses the issue of the Grand Aerie's supervision of local chapters:

The operation of a licensed or unlicensed Local Aerie is not subject to Grand Aerie supervision and control, except as provided in Section 39.4.[1]

As to the operation of the social rooms and the conduct of members and guests in such social rooms, the House Rules and By–Laws of the Local Aerie are the exclusive governing authority.

■ It is well established that a breach of a voluntarily assumed duty can give rise to tort liability. *Louisville Cooperage Co. v. Lawrence*, 313 Ky. 75, 230 S.W.2d 103, 105 (1950). A threshold inquiry under this doctrine is whether the putative tortfeasor has actually and specifically undertaken to render the services allegedly performed without reasonable care. *Good v. Ohio Edison Co.*, 149 F.3d 413, 420 (6th Cir.1998); *In re Temporomandibular Joint [TMJ] Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1493 (8th Cir.1997) ("The scope of this undertaking defines and limits an actor's duty . . . ."). Further, "[t]he actor's knowledge that the undertaking serves to reduce the risk of harm to another or circumstances that would lead a reasonable person to the same conclusion is a prerequisite for an undertaking . . . ." Restatement (Third) of Torts: Liability for Physical Harm § 42 cmt. d (Proposed Final Draft No. 1, 2005). Our cases imposing tort liability for the breach of a voluntarily assumed duty have been consistent with this threshold requirement. *See, e.g. Johnson v. Brey*, 438 S.W.2d 535, 536 (Ky. 1969) (defendant voluntarily undertook to hold back a branch as plaintiff passed by); *Louisville Cooperage Co.*, 230 S.W.2d at 104 (defendant voluntarily undertook to keep wood shavings wet at all times; breach of this agreement caused fire); *Estep v. B.F. Saul Real Estate Inv. Trust*, 843 S.W.2d 911, 914 (Ky.App.1992) (defendant voluntarily undertook to clear its parking lot and sidewalks of snow).

■ In the case *sub judice*, the Grand Aerie's statute relied upon by the Carneyhans as establishing an undertaking not only fails to mention "the services allegedly performed without reasonable care," *TMJ Implants Prod. Liab. Litig.*, 113 F.3d

---

1. Section 39.4, which provides for the Grand Aerie's authority to appoint an agent to control a local chapter whose charter has been suspended, is inapplicable to the facts of this case.

at 1493, but it is also subject to Section 89.10, which expressly disclaims a supervisory role for the Grand Aerie and specifically provides for local control over the precise activity in question, *i.e.*, the operation of a local chapter's social room. Moreover, the limiting language in Section 39.2(c) further weakens the Carneyhans' assertion of a voluntarily assumed broad supervisory role. Section 39.2(c) provides the Grand Aerie with the authority to revoke a charter "[u]pon good cause shown" of the local chapter's violation of law. This language suggests that when the Grand Aerie drafted its statutes, it contemplated a passive role, rather than the actively investigative role that the Carneyhans suggest. *Compare Morrison v. Kappa Alpha Psi Fraternity*, 738 So.2d 1105, 1118 (La. Ct.App.1999) (holding that a national organization had voluntarily assumed a duty to supervise and prevent hazing by its local chapters where it had issued antihazing regulations, retained the ability to control the intake and expulsion of members, and established a network of national and regional authorities and alumni advisors who regularly audited and supervised local chapters and reported to the national fraternity). The record thus refutes the argument that the Grand Aerie imposed upon itself the sweeping affirmative duty to supervise each of its local chapters' compliance with local, state, and federal law. *Cf. Ky. Laborers Dist. Council Health and Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F.Supp.2d 755, 774 (W.D.Ky.1998) ("Defendants may have made vaguely promissory statements to the general public, but the complaint fails to allege that they assumed a duty to render services of any sort to the [Plaintiffs]."). We hold that the Grand Aerie did not undertake a duty to affirmatively supervise Aerie 4313 to ensure its compliance with the law.[2]

### B. *Affirmative Duty to Control Another.*

■ Although the Grand Aerie did not voluntarily assume the duty to supervise Aerie 4313, the question remains whether it nevertheless had a duty to oversee the local chapter and, if so, to what extent. The Carneyhans argue that the "universal duty of care," discussed in *Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell*, 736 S.W.2d 328 (Ky.1987), imposes a duty upon the Grand Aerie to exercise reasonable care in supervising its local chapters. The issue of whether the Grand Aerie had such a duty is a question of law. *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 248 (Ky.1992).

■ In *Grayson*, we held that a "dram shop" that served intoxicating liquor to a person actually or apparently under the influence of alcohol could be held liable for harm subsequently caused by the intoxicated person. *Id.* at 334–35. At the outset of our analysis, we noted "that every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury." *Id.* at 332. However, this proposi-

**2.** Even if the Grand Aerie had undertaken to render services, it does not necessarily follow that the Grand Aerie voluntarily assumed the duty to protect a third person. Before such a voluntarily assumed duty can be found, one of three further preconditions must exist: (1) the failure to exercise reasonable care in performing the undertaking must increase the risk of harm; (2) the duty undertaken must already be owed to the third person by another; or (3) the third person must rely on the undertaking. *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 538 (Ky.2003); Restatement (Second) of Torts § 324A (1965). *See also* Restatement (Third) of Torts: Liability for Physical Harm § 43 (Proposed Final Draft No. 1, 2005). Because we hold that the Grand Aerie has not made an undertaking at all, we do not address the existence of any of the three further preconditions.

tion, frequently cited as the "universal duty of care," is not boundless.

The requirement of "duty to all" is a beginning point for any duty analysis. The examination must be focused so as to determine whether a duty is owed, and consideration must be given to public policy, statutory and common law theories in order to determine whether a duty existed in a particular situation.

*Fryman v. Harrison,* 896 S.W.2d 908, 909 (Ky.1995). At the outset, we note that the Carneyhans advocate a different theory of liability than that established in *Grayson.* Where *Grayson* held that a dram shop had the duty to exercise reasonable care in the conduct of *its own* activities, the Carneyhans seek to impose a duty upon the Grand Aerie to *control* the activities of *another,* *i.e.,* a semi-autonomous local chapter.

 As a general rule, an actor whose own conduct has not created a risk of harm has no duty to control the conduct of a third person to prevent him from causing harm to another. *E.g., Tarasoff v. Regents of Univ. of Cal.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 343 (1976); *Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 296 S.E.2d 693, 696 (1982); *Mangeris v. Gordon,* 94 Nev. 400, 580 P.2d 481, 483 (1978); *Gelbman v. Second Nat. Bank of Warren,* 9 Ohio St.3d 77, 458 N.E.2d 1262, 1264 (1984); *Gulf Reston, Inc. v. Rogers,* 215 Va. 155, 207 S.E.2d 841, 844 (1974); Restatement (Third) of Torts: Liability for Physical Harm § 37 cmt. d (Proposed Final Draft No. 1, 2005); Restatement (Sec-

ond) of Torts § 315 (1965). "This rule derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter." *Tarasoff,* 131 Cal.Rptr. 14, 551 P.2d at 343 n. 5. The reason for this common law distinction is that misfeasance creates a new risk of harm to the plaintiff, whereas nonfeasance does not make the plaintiff's situation any worse, although it fails to benefit him. W. Page Keeton *et al., Prosser and Keeton on The Law of Torts* § 56, at 373 (5th ed. 1984).

 A duty can, however, arise to exercise reasonable care to prevent harm by controlling a third person's conduct where: "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection." Restatement (Second) of Torts § 315 (1965). *See also James v. Wilson,* 95 S.W.3d 875, 890 (Ky.App.2002); *Evans v. Morehead Clinic,* 749 S.W.2d 696, 698 (Ky.App.1988); Restatement (Third) of Torts: Liability for Physical Harm § 40, 41 (Proposed Final Draft No. 1, 2005).[3] The Carneyhans do not assert, and there is no evidence in the record to suggest, that the Grand Aerie had a special relationship with the decedent.[4] Accordingly, we confine our discussion to the relationship between the Grand Aerie and Aerie 4313.

---

**3.** This Court has previously imposed a similar requirement in actions against public officials, holding that public officials have a duty to protect a victim from harm posed by a third party only where a special relationship exists between the public officials and the victim. *Commonwealth, Corr. Cabinet v. Vester,* 956 S.W.2d 204, 206 (Ky.1997); *Fryman,* 896 S.W.2d at 910.

**4.** While the record supports an inference that the decedent paid a cover charge to and purchased alcoholic beverages from Aerie 4313, there is no evidence in the record to support the notion that the decedent was also a business invitee of the Grand Aerie.

Whether a special relationship exists between a national fraternal organization and one of its local chapters, as would give rise to an affirmative duty of supervision and control, is a question of first impression in this state. While the courts of other jurisdictions have addressed the issue of a national fraternal organization's negligence in supervising a local chapter, most have done so only by analyzing the national organization's voluntary assumption of a duty to supervise, *supra,* or the national organization's relationship with the party who suffered the harm, rather than its relationship with the local chapter. *See e.g., Foster,* 567 N.E.2d at 872; *Garofalo v. Lambda Chi Alpha Fraternity,* 616 N.W.2d 647, 654 (Iowa 2000); *Prime v. Beta Gamma Chapter of Pi Kappa Alpha,* 273 Kan. 828, 47 P.3d 402, 410–411 (2002); *Morrison,* 738 So.2d at 1118–1120; *Walker v. Phi Beta Sigma Fraternity (Rho Chapter),* 706 So.2d 525, 529–30 (La.Ct.App. 1997). The Carneyhans rely primarily upon a decision of the Court of Appeals of Arizona, which concluded that a special relationship exists between these types of entities. *See Estate of Hernandez by Hernandez–Wheeler v. Flavio,* 186 Ariz. 517, 924 P.2d 1036, 1039 n. 1 (Ct.App.1995) ("[T]he knowing association with the local chapter described above could create the special relationship imposing a duty of care."), *vacated in part on other grounds, Estate of Hernandez by Hernandez–Wheeler v. Flavio,* 187 Ariz. 506, 930 P.2d 1309, 1315 (1997). The court reached this conclusion without analysis, however, and thus its decision has little persuasive effect. To determine whether this relationship should be included within the class of special relationships giving rise to an affirmative duty of control, it is necessary to examine the characteristics of the special relationships that have received widespread judicial recognition.

Well-settled special relationships giving rise to a duty to control a third person's conduct include the relationships between parent and minor child, Restatement (Second) of Torts § 316 (1965), master and servant where the harm is committed with means supplied to the servant by virtue of the employment, *id.* § 317, owner of land or a chattel and the person using such, *id.* § 318, one who takes charge of a person with dangerous propensities and the person under control, *id.* § 319, and mental health professional and patient, Restatement (Third) of Torts: Liability for Physical Harm § 41(b)(4) (Proposed Final Draft No. 1, 2005). The Restatement's enumeration of special relationships is not exclusive. *Kinsey v. Bray,* 596 N.E.2d 938, 941 (Ind.Ct.App.1992); *Newton v. Tinsley,* 970 S.W.2d 490, 493 (Tenn.Ct.App.1997); *Gulf Reston,* 207 S.E.2d at 844; Restatement (Third) of Torts: Liability for Physical Harm § 41 cmt. i (Proposed Final Draft No. 1, 2005). *See also Thompson ex rel. Thompson v. Skate Am., Inc.,* 261 Va. 121, 540 S.E.2d 123, 129 (2001) (listing several *de jure* and *de facto* special relationships). "The key in each [special relationship] is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055, 1061 (2001).

There are two distinct types of claims based upon a defendant's special relationship with the person causing the harm. The first type, which can be labeled "negligent failure to warn," is generally premised upon the defendant's "enhanced ability to observe the conditions under which [the person causing the harm] might be expected to be especially dangerous...." *Div. of Corr. v. Neakok,* 721 P.2d 1121, 1126 (Alaska 1986). The most

common applications of this theory of liability occur within the contexts of the state/parolee relationship, *id.*, and the psychotherapist/patient relationship, *Tarasoff*, 131 Cal.Rptr. 14, 551 P.2d at 344 ("[B]y entering into a doctor-patient relationship the therapist becomes sufficiently involved to assume some responsibility for the safety, not only of the patient himself, but also of any third person whom the doctor knows to be threatened by the patient.") (quoting John G. Fleming & Bruce Maximov, *The Patient or His Victim: The Therapist's Dilemma*, 62 Cal. L.Rev. 1025, 1030 (1974)).

The Carneyhans have not claimed that the Grand Aerie negligently failed to warn of Aerie 4313's activities; rather, their claims fall within the second category: "negligent failure to control." In this type of claim, the considerations articulated in *Neakok* become less significant. Instead, the alleged tortfeasor's *ability to control* the person causing the harm assumes primary importance. *See Poncher v. Brackett*, 246 Cal.App.2d 769, 55 Cal.Rptr. 59, 61 (1966) ("[T]he absence of such ability is fatal to a claim of legal responsibility."); *Lundgren v. Fultz*, 354 N.W.2d 25, 27 (Minn.1984) ("Implicit in the duty to control is the *ability* to control."); *Grover v. Stechel*, 132 N.M. 140, 45 P.3d 80, 84 (Ct. App.2002) ("In order to create a duty based on a special relationship, the relationship must include the right or ability to control another's conduct."); Restatement (Third) of Torts: Liability for Physical Harm § 41, Rep. Note cmt. h (Proposed Final Draft No. 1, 2005) ("Some courts have reasoned that because a physician does not have control over the patient, no special relationship exists.... That reasoning is most persuasive when the plaintiff claims defendant's negligence in failing to control the patient.").

■ Moreover, the defendant's ability to control the person who caused the harm must be real and not fictional and, if exercised, would meaningfully reduce the risk of the harm that actually occurred. Special relationships involving entities in charge of a person with dangerous propensities are illustrative of what is necessary for a special relationship: courts of other jurisdictions have required a substantial degree of control. *See Neakok*, 721 P.2d at 1126 (parolee remained subject to state control where state could impose special conditions of parole tailored to prevent foreseeable harm and enforce such conditions with threat of parole revocation); *Taggart v. State*, 118 Wash.2d 195, 822 P.2d 243, 255 (1992) (same conclusion where parole officers could supervise parolees to ensure compliance with terms of parole, and where parole could be revoked upon noncompliance).[5] The Ohio Supreme Court has held that a duty to exercise control lies even within certain psychotherapist/outpatient relationships (usually the context for claims of negligent failure to warn), if the psychotherapist has sufficient ability to control the outpatient or his vio-

---

5. Some jurisdictions require even stricter control to find a special relationship in such circumstances. These courts have reasoned that because of the lack of actual physical custody, a state's relationship with a parolee or probationer lacks the requisite control to be a special relationship. *Schmidt v. HTG, Inc.*, 265 Kan. 372, 961 P.2d 677, 687 (1998); *Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297, 1304 (1985) ("The probationer was essentially free to conduct his day-to-day affairs, and was responsible for reporting certain activities.... [T]he officers were evidently not responsible for supervising the probationer on a daily basis."); *Small v. McKennan Hosp.*, 403 N.W.2d 410, 414 (S.D.1987); *Fox v. Custis*, 236 Va. 69, 372 S.E.2d 373, 376 (1988) ("[P]arolees ordinarily are essentially free to conduct their day-to-day affairs, adhering to specific rules and reporting certain activities to the parole officer as they occur or are planned.").

lent tendencies. *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St.3d 284, 673 N.E.2d 1311, 1322–24 (1997). Crucial to the court's reasoning was the existence of "a number of anticipatory measures that could be taken in the outpatient setting to prevent the patient's violent propensities from coming to fruition." *Id.* at 1323. In other words, the psychotherapist possessed means of control that could have prevented the very harm that occurred.

Judicially imposed limitations on special relationships between employers and employees are highly illuminating as to the degree of ability to control sufficient to give rise to a duty of reasonable care in the exercise of control. The Second Restatement provides that a special relationship exists between master and servant only if the servant is using an instrumentality of the employment relationship to cause harm, *i.e.,* either the master's chattel or premises entered by virtue of the employment relationship. Restatement (Second) of Torts § 317 (1965). The proposed Third Restatement puts this requirement more succinctly: "Special relationships giving rise to the duty provided in [§ 41(a)] include: ... (3) an employer with employees *when the employment facilitates the employee's causing harm to third parties."* Restatement (Third) of Torts: Liability for Physical Harm § 41(b)(3) (Proposed Final Draft No. 1, 2005) (emphasis added). *See also Marusa v. Dist. of Columbia,* 484 F.2d 828, 831 (D.C.Cir.1973) (city had duty of reasonable care in training and supervision of police officer who caused off-duty injury with service revolver); *Ponticas v. K.M.S. Investments,* 331 N.W.2d 907, 911 (Minn. 1983) (apartment owner had duty to exercise reasonable care in hiring employee who later used passkey issued by apartment owner to rape tenant); *McCrink v. City of New York,* 296 N.Y. 99, 71 N.E.2d 419, 422 (1947) (city had duty of reasonable care in retention of police officer who, while off-duty, shot and killed plaintiff's decedent with service revolver); *Hutchison ex rel. Hutchison v. Luddy,* 560 Pa. 51, 742 A.2d 1052, 1060 (1999) (evidence sufficient to support negligent supervision and retention claim against employer where employee used his status as such to enter minor's motel room where sexual abuse occurred). Again, the common thread through the above-described employment relationships is that the employer has a real means of control over the employee which, if exercised, would meaningfully reduce the risk of harm. *See Weaver v. African Methodist Episcopal Church, Inc.,* 54 S.W.3d 575, 582–83 (Mo.Ct.App.2001) ("Such limitations serve to restrict the master's liability for a servant's purely personal conduct which has no relationship to the servant's employment and the master's ability to control the servant's conduct or prevent harm.").

Courts that have evaluated claims to less well-settled special relationships have also sought evidence of an ability to control in a manner that would be meaningful in the prevention of the harm that actually occurred. In *Lester ex rel. Mavrogenis v. Hall,* 126 N.M. 404, 970 P.2d 590 (1998), the plaintiff was injured in an automobile collision and sued the other driver's doctor, claiming that the doctor's failure to warn his patient of side effects of a prescribed medication caused the collision. The Supreme Court of New Mexico held that the doctor owed no duty to the plaintiff, reasoning in part that a warning to the patient would likely have little efficacy, absent evidence that the warned patient would have actually responded and refrained from driving. *Id.* at 597. In *Hamilton,* the New York Court of Appeals concluded that handgun manufacturers had no duty to control aftermarket pur-

chasers of the manufacturers' handguns, holding that there was no special relationship between the manufacturers and the wrongdoers or the plaintiffs' decedents. 727 N.Y.S.2d 7, 750 N.E.2d at 1061–62, 1066. Because the plaintiffs sought to impose liability for the criminal use of handguns that had wound their way through a multilevel distribution chain and often through several purchasers, the court found persuasive the fact that the defendant manufacturers were not in a realistic position to prevent the wrongs. *Id.* at 1062. Finally, in *Graff v. Beard,* 858 S.W.2d 918 (Tex.1993), the Supreme Court of Texas was faced with a question of a social host's liability for harm caused by an intoxicated guest. The court held that the social hosts had no duty to prevent their guest from consuming alcohol or later driving, in part because the hosts had no means of effective control over the guest: "we cannot assume that guests will respond to a host's attempts, verbal or physical, to prevent the guests from driving." *Id.* at 921–22.

There is indeed a current running through the relevant Restatement sections [and the judicial opinions evaluating miscellaneous claims of special relationships] that in order for a special relation to exist between the defendant and the third person, the defendant must have the ability to control the third person's conduct. Moreover, the cases from which these sections derive indicate that the ability to control is not the fictitious control which provides the basis for vicarious liability. Instead, "control" is "used in a very real sense." *Estates of Morgan,* 673 N.E.2d at 1322–23 (quoting Fowler V. Harper & Posey M. Kime, *The Duty to Control the Conduct of Another,* 43 Yale L.J. 886, 891 (1934)). A "real" ability to control necessarily includes some sort of leverage, such as the threat of involuntary commitment, *Estates of Morgan,* 673 N.E.2d at 1324, parole revocation, *Neakok,* 721 P.2d at 1126, or loss of the livelihood provided by an employment relationship, *Hills v. Bridgeview Little League Ass'n,* 195 Ill.2d 210, 253 Ill.Dec. 632, 745 N.E.2d 1166, 1185 (2000). Not only must the control be "real," but it also must be related in some manner to the harm caused by the person under control, such that its exercise would restrict the person's ability to cause harm. Absent such control, there is no special relationship giving rise to a duty of reasonable care.

■ Turning to the facts of the case *sub judice,* the only method of control that the Grand Aerie maintained over Aerie 4313 was the ability to revoke its charter. The record is clear that the Grand Aerie otherwise disclaimed all supervision and control, and that Aerie 4313 operated in a manner consistent with that disclaimer. Aerie 4313 had wide discretion over whom to admit or expel as members, and over how to conduct chapter business, including social functions. Aerie 4313 conducted all of its business, including social functions, on property owned and leased to it by three of its members (none of whom had any previous or other ties to the Grand Aerie). There is no evidence in the record that Aerie 4313 received any financial benefits from the Grand Aerie, or from being affiliated with the Grand Aerie.

Thus, the revocation of the charter would not have removed any tangible benefit from Aerie 4313. Because the Grand Aerie's ability to revoke the charter provided no genuine leverage over Aerie 4313, it was not a "real" method of control. Moreover, the revocation of the charter would have produced an outcome completely unrelated to the harm that occurred, since Aerie 4313's association with the Grand Aerie did not facilitate its ability to hold social functions and serve alcohol

on its own leased premises. *Cf.* Restatement (Third) of Torts: Liability for Physical Harm § 41 cmt. e (Proposed Final Draft No. 1, 2005) ("Employment facilitates harm to others when the employment provides the employee access to physical locations, ... or to instrumentalities, ... or other means by which to cause harm that would otherwise not be available to the employee."). Such an outcome would not have hindered Aerie 4313 from, upon the inclination of its members, simply renaming itself, *e.g.,* "The Falcons," and continuing to hold social functions and serve alcohol. In contrast with the dubious efficacy of this means of control, the burden upon the Grand Aerie of affirmatively monitoring its local chapters to determine when to exercise such control would be excessive:

> National organizations do not have the ability to monitor the activities of their respective chapters which would justify imposing the duty appellant seeks. The national organization in fraternal groups has only the power to discipline an errant chapter after the fact. It does not possess the resources to monitor the activities of its chapters contemporaneously with the event.

*Alumni Ass'n v. Sullivan,* 524 Pa. 356, 572 A.2d 1209, 1213 (1990) (holding national fraternity not liable for property damage resulting from fire set by minor student who had been served alcoholic beverages at party hosted by local chapter). Because the Grand Aerie had no actual ability to control Aerie 4313's conduct of its social functions, no special relationship existed giving rise to a duty on the part of the Grand Aerie to exercise reasonable care to control Aerie 4313 so as to prevent the death of the Carneyhans' decedent.

Accordingly, we reverse the Court of Appeals and reinstate the summary judgment entered by the Trigg Circuit Court in favor of the Grand Aerie.

GRAVES, JOHNSTONE, and SCOTT, JJ., concur.

ROACH, J., concurs in result only without separate opinion.

LAMBERT, C.J., dissents by separate opinion, with WINTERSHEIMER, J., joining that dissenting opinion.

Dissenting Opinion by Chief Justice LAMBERT.

Respectfully, I must dissent from the majority's opinion.

The majority "decline[s] to hold that advice on how to operate at a profit is an inappropriate subject matter for inclusion in a manual providing guidelines for the efficient operation of an organization." However, the officers' handbook gives specific instructions on how to profit from the sale of alcoholic beverages, notwithstanding numerous other activities that an organization can utilize to turn a profit. Thus, the purpose for including the provision does not appear as benign as the majority indicates. The focus is not merely on how to make a profit, but rather how to profit from the sale of alcohol.

Furthermore, the majority opines that because Grand Aerie received no portion of the revenues from its local chapters' social events, it likely had little or no interest in whether its local chapters engaged in the sale or service of alcohol. This begs the question of why, then, did Grand Aerie include the alcohol profit provision. Perhaps, it hoped that the sale of alcohol would make the organization more enticing and induce people to join the chapter or would create a reputation for the organization that would induce other locales to form chapters. As the majority notes, Grand Aerie does receive a per capita tax

from its local chapters, financed no doubt from the sale of alcohol.

There are many possibilities for Grand Aerie's inclusion of the alcohol profit provision in its officer's handbook, which is precisely why this case is inappropriate for summary judgment. Perhaps, a jury would ultimately find that Grand Aerie did not intend to induce or encourage the sale of alcohol at its local chapters. However, a jury should have the opportunity to evaluate any proffered purposes or intentions and make factual findings of whether Grand Aerie encouraged or induced the chapters to sell alcohol and thereby assumed a duty to supervise these activities.

WINTERSHEIMER, J., joins this dissenting opinion.