**James MURRAY and Ruth Gould, Plaintiffs–Appellants,**

v.

**NORTHROP GRUMMAN INFORMATION TECHNOLOGY, INC., Defendant–Appellee.**

**Docket No. 04–5097 CV.**

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 2005.

Decided April 10, 2006.

Eamonn Dornan, Smith Dornan & Dehn P.C., New York, New York, for Plaintiffs–Appellants.

Ruth E. Harlow, White & Case LLP (Peter C. Trimarchi, on the brief), New York, New York, for Defendant–Appellee.

Before: WALKER, Chief Judge, FEINBERG and CARDAMONE, Circuit Judges.

WALKER, Chief Judge.

James Murray and Ruth Gould, the Appellants, came to the United States on nonimmigrant visas under the Irish Peace Process Cultural and Training Program ("IPPCTP"), a program established by Congress. When their relationship with their American employer soured, the employer told Northrop Grumman Information Technology, Inc. ("NGIT"), the Program Administrator of the IPPCTP, that Murray and Gould had never actually worked for him and that they were threats to national security. Based on these allegations, the Immigration and Naturaliza-

tion Service ("INS")[1] detained Murray and Gould, and NGIT terminated them from the program. The INS initiated deportation proceedings based principally on NGIT's transmittal of the employer's accusations to the government. Appellants sued NGIT, upon a claim of injuries as a result of NGIT's alleged negligence, negligent misrepresentation, defamation, and breach of contract. The District Court for the Eastern District of New York (Allyne E. Ross, *Judge*) granted summary judgment to NGIT. This appeal followed.

## BACKGROUND

In 1998, Congress enacted the Irish Peace Process Cultural and Training Program Act of 1998, Pub.L. No. 105–319, 112 Stat. 3013 amending the Immigration and Nationality Act "to allow young people from disadvantaged areas of [Ireland] suffering from sectarian violence and high structural unemployment to enter the United States for the purpose of developing job skills and conflict resolution abilities in a diverse, cooperative, peaceful, and prosperous environment, so that those young people can return to their homes better able to contribute toward economic regeneration and the Irish peace process." *Id.* § 2(a)(1), 112 Stat. at 3013. To achieve this end, the program allots up to 4,000 nonimmigrant "Q–2" visas per year, *id.* § 2(a)(2), 112 Stat. at 3013, which allow their holders to work in the United States. 8 U.S.C. § 1101(a)(15)(Q)(ii).

The Department of State ("DOS") and the INS, who are responsible for general oversight and enforcement of the IPPCTP provisions, 22 C.F.R. § 139.1(b), issued regulations for the administration of the program in March of 2000. Irish Peace Process Cultural and Training Program Interim Rule, 65 Fed.Reg. 14,764, 17,768 (Mar. 17, 2000) (codified at 22 C.F.R. pt. 139). The regulations delegate responsibility for day-to-day operation of the program to a Program Administrator ("PA"). 22 C.F.R. § 139.1(b). The day-to-day responsibilities of the PA include, *inter alia,* identifying job opportunities for program participants, recommending employers for participation in the program to the DOS, which has final authority for approving employers, *id.,* and issuing letters of certification to aliens approved for the program. *Id.* § 139.4. NGIT was selected as the PA.

Under the IPPCTP regulations, the PA is responsible for monitoring participants' compliance with program requirements. *Id.* § 139.4(e). The PA is required to terminate from the program any participant who is fired for cause, fails to find approved employment within thirty days of leaving prior, approved employment, fails to comply with program regulations, or engages in unauthorized employment. *Id.* § 139.4(i). The PA is obligated to report to the DOS and INS on certain aspects of the program, including informing the DOS and INS "promptly (normally within five business days)" of the termination or withdrawal from the program of a participant. *Id.* § 139.4(g).

After they were approved to participate in the IPPCTP, Murray and Gould began working in August 2001 at Kitty Hawk Kites in Nags Head, North Carolina. After the terrorist attacks of September 11, 2001, and business at Kitty Hawk Kites slowed, Murray and Gould told NGIT that

---

**1.** Responsibility for enforcement of immigration law has been transferred from the INS to the Bureau of Immigration and Customs Enforcement, a unit of the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135. Because all events discussed in this opinion took place prior to that transfer, we will continue to refer to the INS.

they wanted to transfer to Las Vegas Airports ("LVA"), a hang-gliding school in Las Vegas, Nevada owned by Steve Smith. NGIT corresponded with Smith to verify that LVA qualified for the program, and recommended it for approval to the DOS. The DOS then approved LVA as an IPPCTP employer.

Appellants moved to Las Vegas and began work at LVA in October of 2001. Their complaint alleges that in early December of 2001, they began to have concerns about Smith's conduct. He did not pay them and told them that business was too slow; he said that they would be paid when they brought in new clients. He also demanded that they clean his home and his car, tasks unrelated to their agreed-upon responsibilities. His hang-gliding training methods exposed Appellants to unnecessary hazards, and he boasted about his experiences with drugs and prostitutes. As this behavior continued, the complaint alleges, Appellants' relationship with Smith deteriorated by January 10, 2002, to the point that Smith refused to provide Appellants with work and did not respond to their attempts to contact him. Appellants nonetheless continued to advertise Smith's business in the hopes of securing new clients and getting paid.

On January 30, 2002, Appellants informed NGIT of their concerns about Smith. On February 13, 2002, Appellants again complained to NGIT about Smith's behavior, said that he had violated his obligations under the IPPCTP, and requested a transfer to a third employer.

Later that same day, Smith called NGIT and alleged that neither Murray nor Gould had ever worked for him, that both of them were working for many different employers, and that Murray was getting his pilot's license. NGIT asked Smith to put these claims in writing, and the following day he sent a fax stating that he had not seen either Murray or Gould for four months, that they had never worked for him, that they were both working for others in the Las Vegas area, and that Murray was getting his pilot's license in order to open a business in Yemen. He also stated that "[t]heir views are opposing United States policy" and that they had said that "terrorism in this country can not [sic] be beat and so long as the USA supports Israel it will only get worse." Smith urged NGIT to forward this information to the INS and the FBI and concluded that "[c]onsidering our nations [sic] state of security of foreign terrorism [sic,] this is of grave concern."

NGIT notified the DOS and INS of Smith's accusations. At the request of the DOS and INS, NGIT sent all of its documentation regarding Appellants to those agencies, along with a cover letter that characterized Smith's statements as allegations and noted that, based on NGIT's records, there was no reason to believe that Murray and Gould had not been working at LVA. Within a few days, the INS took Appellants into custody. After Appellants told the INS that they were no longer in Smith's employ, the INS determined that Appellants were out of status with the IPPCTP, because more than thirty days had passed since the end of their approved employment, and initiated removal proceedings against them. On April 16, 2002, NGIT formally informed Appellants that they were out of status and had been terminated from the program based on the fact that they had not worked for Smith since December of 2001. At an immigration hearing on May 28, 2002, Appellants were ordered removed.

Murray and Gould brought this suit against NGIT for negligent misrepresentation, defamation, negligence, and breach of contract, claiming psychological injuries, loss of working privileges, and legal ex-

penses as a result of their arrest, incarceration, and deportation. The negligence claim asserts that NGIT breached five duties allegedly owed to Appellants: (1) to investigate Smith's allegations before conveying them to the DOS or INS; (2) to reinstate Appellants in the IPPCTP after discovering that Smith's allegations were false; (3) to facilitate a second change of employer; (4) to mediate Appellants' employment dispute with Smith; and (5) to investigate the *bona fides* of Smith's business. NGIT moved for summary judgment and the district court granted the motion. This appeal followed.

## DISCUSSION

We review *de novo* a district court's grant of summary judgment. *Pannonia Farms, Inc. v. USA Cable*, 426 F.3d 650, 652 (2d Cir.2005) (per curiam). Construing all evidence in the light most favorable to the non-moving party, *id.*, summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

### I. Official Immunity

Appellants' claims are largely based on NGIT's transmittal to the DOS and INS of Smith's allegations that Murray and Gould posed a possible terrorist threat. NGIT asserts as a defense that this transmittal is protected by official immunity. We agree.

The doctrine of official immunity is designed to promote the effective administration of government affairs by ensuring that government officials are "free to exercise their duties unembarrassed by the fear of damage suits." *Barr v. Matteo*, 360 U.S. 564, 571, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (plurality opinion). As the Supreme Court has made clear, official immunity is not meant "to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation." *Westfall v. Erwin*, 484 U.S. 292, 295, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988). The doctrine rests on the premise that the threat of damage suits might "appreciably inhibit the fearless, vigorous, and effective administration of policies of government." *Barr*, 360 U.S. at 571, 79 S.Ct. 1335. Moreover, government can function more effectively and efficiently "if officials are freed of the costs of vexatious and often frivolous damages suits." *Westfall*, 484 U.S. at 295, 108 S.Ct. 580.

In *Westfall*, the Supreme Court held that federal officials are entitled to absolute immunity from state tort liability for acts that are: (a) discretionary in nature and (b) fall within the scope of the officials' duties. *Id.* at 295–98, 108 S.Ct. 580. This test, as it applies to federal employees, was superseded by the passage of the Federal Employees Liability Reform and Tort Compensation Act. *See* 28 U.S.C. § 2679(d). But "the *Westfall* test remains the framework for determining when non-governmental persons or entities are entitled to the same immunity." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 72 (2d Cir.1998).

The first question is whether NGIT is carrying out a governmental function such that the doctrine of official immunity should apply. The immunity inquiry is a functional one. We stated in *Pani*: "'The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy' or by private contractors." *Id.* at 73

(quoting *Barr*, 360 U.S. at 573, 79 S.Ct. 1335). Therefore, the same policy considerations that justify immunity for government employees can apply with equal force to private actors when they are charged with implementing government policies. *See, e.g., id.; Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1447 (4th Cir.1996) ("Even though private persons under contract with the government act only partly in the public sphere, the public interest may demand that immunity protect them to the same extent that it protects government employees."); *Nu–Air Mfg. Co. v. Frank B. Hall & Co. of N.Y.*, 822 F.2d 987, 995 (11th Cir.1987) (recognizing that courts occasionally have extended official immunity to the private sector); *Blum v. Campbell*, 355 F.Supp. 1220, 1224 (D.Md. 1972) (extending official immunity to the private company that managed a property owned by the Federal Housing Authority); *cf. Boyle v. United Techs. Corp.*, 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (holding that a government contractor is not liable for design defects in military equipment when the government would have been immunized from liability had it produced the equipment itself).

▮ We think that when a private contractor, hired to perform a quintessential governmental function, in the course of its official duties conveys information with possible national security implications to the agency charged with its oversight, that contractor is absolutely immune from state tort liability for claims resulting from that information-sharing. As the administrator of a program under the United States' immigration laws, NGIT therefore is entitled to official immunity for tort actions arising out of its transmittal of Smith's allegations regarding Appellants to the DOS and INS.

NGIT's actions easily satisfy the *Westfall* test. First, NGIT was acting within the scope of its obligations to the DOS and INS. NGIT is required by federal regulations to monitor and report on the IPPCTP and its participants' compliance with program requirements and to notify the DOS and INS promptly whenever a participant is terminated from his/her employment. *See* 22 C.F.R. § 139.4. In conveying the information from Smith to the DOS and INS, NGIT was acting within the scope of its employment. Second, the action was discretionary. There are no provisions in the IPPCTP statute or regulations that instructed NGIT, as Program Administrator, on what to do with allegations that program participants may be threats to national security. Upon receipt of those allegations, NGIT employees were left to determine the appropriate course of action and its timing. NGIT's decision to share the information with the DOS and INS immediately and without further investigation was a discretionary act.

We recognize that absolute immunity comes at a price; it sometimes allows an "injured party with an otherwise meritorious tort claim [to be] denied compensation simply because he had the misfortune to be injured by" an individual entitled to immunity. *Westfall*, 484 U.S. at 295, 108 S.Ct. 580. For this reason, the Supreme Court has cautioned that immunity is appropriate only when "the contributions of immunity to effective government ... outweigh the ... harm to individual citizens." *Doe v. McMillan*, 412 U.S. 306, 320, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).

The balance here tips strongly in favor of immunity. NGIT's action in forwarding the information it received from Smith to the DOS and INS is precisely the type of discretionary action that sound public policy requires to be protected by official immunity. The DOS and INS delegated responsibility to NGIT to administer an international program under the United

States' immigration laws. Information relating to the immigration status of alien program participants, including information with national security implications, could be expected to come to NGIT's attention. The public interest in ensuring that immigration law administrators feel free to convey information of this nature to the proper government agencies is high. The threat of damage suits arising from the transmittal of such information would deter a company in NGIT's position from promptly sharing that information with government agencies. The incentives should be the other way: to encourage administrators like NGIT to pass along sensitive allegations promptly to the overseeing federal agencies, which are in the better position to investigate and act on the information. We therefore find that applying immunity in this circumstance is consistent both with protecting "officials who are required to exercise their discretion" and promoting the "public interest in encouraging the vigorous exercise of official authority." *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

Appellants argue that NGIT's actions in immediately sharing information with the DOS and INS, without verifying the allegations, were negligent. Granting official immunity to NGIT obviates the need for that analysis. We observe, however, that the claim of negligence would be far more compelling if NGIT had not transmitted sensitive national security information and harm to American citizens from terrorist acts had resulted. Of course, nothing we decide here necessarily forecloses actions against either Smith, the source of the allegations, or against the government agencies who detained and incarcerated Appellants based on those allegations. We express no opinion, however, as to whether any such action might succeed.

This is not the first time a court has extended official immunity to government contractors and their employees for the allegedly *tortious effects of sharing information* with the government agency charged with their oversight. In *Pani*, we upheld official immunity for a Medicare insurance carrier that reported possible Medicare fraud to the Department of Health and Human Services, concluding that "investigation and reporting of possible Medicare fraud is precisely the type of delegated discretionary function that the public interest requires to be protected by immunity." *Pani*, 152 F.3d at 69, 73; *see Slotten v. Hoffman*, 999 F.2d 333, 337 (8th Cir.1993) (official immunity for private party's transmission of information pursuant to obligations to government agencies); *Becker v. Philco Corp.*, 372 F.2d 771, 774 (4th Cir.1967) (official immunity from libel action where employer reported information to the Defense Department); *see also Bushman v. Seiler*, 755 F.2d 653 (8th Cir. 1985) (official immunity from a defamation action based on a report submitted by a private Medicare consultant); *Gulati v. Zuckerman*, 723 F.Supp. 353 (E.D.Pa.1989)(official immunity from state tort liability to defense contractor based on all information conveyed to the Defense Department).

Because we hold that NGIT is absolutely immune from suit for state tort actions arising from its sharing of information regarding Appellants with the DOS and INS, we affirm the dismissal of Appellants' claims of negligent misrepresentation and defamation. We also affirm the dismissal of the negligence claim insofar as it alleges that NGIT had a duty to investigate Smith's allegations before conveying them to the DOS and INS.

## II. Remaining Negligence Claims

█ Several of Murray and Gould's negligence claims against NGIT arise from

conduct unrelated to sharing information with the DOS and INS and thus are not necessarily subject to the official immunity analysis laid out above. These claims allege that NGIT breached its duties to (1) reinstate Appellants in the IPPCTP after discovering that Smith's allegations were false; (2) facilitate a second change of employer; (3) mediate Appellants' employment dispute with Smith; and (4) investigate the *bona fides* of Smith's business. Because we hold that NGIT never owed these duties to Appellants, we need not decide whether NGIT is entitled to official immunity for torts not arising from information-sharing.

Under both New York and Virginia law,[2] a negligence claim can proceed only if the defendant owes a duty of care to the plaintiff. *Eiseman v. State,* 70 N.Y.2d 175, 187, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (1987); *Fox v. Custis,* 236 Va. 69, 372 S.E.2d 373, 375 (1988). In both jurisdictions, the existence of a duty is a question of law. *Palka v. Servicemaster Mgmt. Servs. Corp.,* 83 N.Y.2d 579, 585, 611 N.Y.S.2d 817, 634 N.E.2d 189 (1994); *Fox,* 372 S.E.2d at 375.

Appellants point to the regulations governing the IPPCTP as the source of the duties they have enumerated. The regulations, however, do not impose such duties on NGIT. First, the regulation that governs reinstatement is permissive, not obligatory. *See* 22 C.F.R. § 139.5(f) ("[T]he [PA], . . . upon being satisfied that reinstatement serves the purpose of the program, may issue a new or amended certification letter."). NGIT therefore had no duty to reinstate Appellants into the program once they had been terminated.

Second, the regulations explicitly state that "[u]nless otherwise authorized, the [PA] may approve only one change of approved employer per participant per period of stay." *Id.* § 139.4(c)(2). Appellants had already changed employers once. In order to authorize a second change, NGIT would have had to procure authorization from the DOS or INS. Therefore, NGIT did not have the authority, much less the duty, to facilitate a second change of employer for Appellants. Third, the claimed duty to mediate Appellants' employment dispute with LVA also exceeds the obligations contained in the IPPCTP regulations. Those regulations require employers to agree to permit the PA to mediate any employee termination as a condition of being approved as IPPCTP employers. *Id.* § 139.4(e). The existence of an opportunity to mediate is not the equivalent of a requirement to do so should the PA determine that mediation is inappropriate. Mediation, like reinstatement, is subject to the PA's discretionary decision. Finally, Appellants fail to point to any source of NGIT's alleged duty to investigate the *bona fides* of Smith's business. NGIT secured all the paperwork and assurances required by the IPPCTP regulations from LVA before recommending it to the DOS as an approved employer under the IPPCTP. They had no duty to go beyond those requirements. The district court's dismissal of these negligence claims is therefore affirmed.

### III. Breach of Contract Claims

Appellants allege that, as participants in the IPPCTP, they were parties to an implied-in-fact contract between themselves

---

**2.** In the district court, the parties seemed to agree, without explicitly so stating, that the scope of the duty that NGIT owed to Appellants was governed by New York law. On appeal, NGIT contends that Virginia law governs because NGIT's allegedly tortious conduct took place within the borders of Virginia. Our disposition does not require us to resolve this conflict.

and NGIT, as well as third-party beneficiaries of a contract between NGIT and LVA. Appellants further allege that NGIT breached these contracts and that appellants have been damaged by this breach.[3] As correctly pointed out by the district court, these claims fail as a matter of law. Neither of the claimed contracts was enforceable because no consideration was exchanged between the parties alleged to have contracted with one another.

■■■■ Under New York law,[4] an implied-in-fact contract requires all of the elements required of any valid contract, including consideration, mutual assent, legal capacity, and legal subject matter. *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 93–94, 699 N.Y.S.2d 716, 721 N.E.2d 966 (1999). A promise to perform a pre-existing legal obligation does not amount to consideration. *Goncalves v. Regent Int'l Hotels, Ltd.*, 58 N.Y.2d 206, 220, 460 N.Y.S.2d 750, 447 N.E.2d 693 (1983). Appellants argue that NGIT's issuance of certification letters to them induced them to travel to the United States and that this exchange constitutes consideration for their implied-in-fact contract. But it was NGIT's requirements under its contract with the DOS, not its desire to induce Appellants to travel to the United States, that obligated it to process Appellants' applications and issue certification letters to them. Therefore, there is no implied-in-fact contract between Appellants and NGIT.

■■■■ These same pre-existing obligations pertain to NGIT's relationship

with LVA. NGIT did not enter into a contract with LVA as to which Appellants could advance a third-party beneficiary claim. NGIT's recommendation that LVA be approved as an IPPCTP employer was not made in consideration for any promise by or detriment to LVA. Instead, NGIT evaluated LVA as a potential employer as it was obligated to do by its contract with the DOS. Without consideration exchanged between NGIT and LVA, there was no contract for NGIT to breach.

Because Appellants' breach of contract claims fail as a matter of law, they were properly dismissed on summary judgment by the district court.

### CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment to Appellee is hereby affirmed.

---

**3.** Appellants also allege in their brief that they are third-party beneficiaries of the contract between NGIT and DOS. This claim was not made in Appellants' original complaint, and it was mentioned just once in passing in their submissions to the district court. The claim is therefore not properly before us and we do not consider it here.

**4.** The parties agree that New York law applies to the contract claims.